## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
OFFICE & PROFESSIONAL EMPLOYEES )
INTERNATIONAL UNION, LOCAL 2, )
)
                Plaintiff, )
)
v. )        No. 1:07-cv-02124-RWR
)
SHEET METAL WORKERS )
INTERNATIONAL ASSOCIATION, )
)
                Defendant. )
_____)

### NOTICE OF FILING

Defendant Sheet Metal Workers International Association, on behalf of both parties, hereby gives notice of filing of the Joint Appendix to Cross Motions for Summary Judgment.

Respectfully submitted,

/s/ John M. West_____
John M. West
D.C. Bar #424718
BREDHOFF & KAISER P.L.L.C.
805 Fifteenth St., N.W. Suite 1000
Washington, D.C. 20005
(202) 842-2600

Counsel for Defendant Sheet Metal
Workers International Association

# Exhibit 1

1

# AGREEMENT

THIS AGREEMENT, effective as of October 1, 2005, but actually executed on November 10, 2005, by and between the SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, with principal offices located in Washington, D.C., hereinafter referred to as the SMWIA, and the OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL LOCAL NO. 2, hereinafter referred to as the Union;

WHEREAS, for the purpose of facilitating the peaceful adjustment of any differences that may arise from time to time between the parties hereto, and to promote harmony and efficiency to the end that all may mutually benefit, the parties hereto contract and agree with each other as follows:

## ARTICLE I

### Termination

This Agreement shall remain in effect until September 30, 2009, and from year to year thereafter unless either party notifies the other in writing by Certified Mail sixty (60) days prior to the expiration date, giving notice of modification or termination of said Agreement. This Agreement shall be subject to modification at any time by mutual consent. Any and all changes to this Agreement shall be reduced to writing and signed by the parties hereto.

## ARTICLE II

### Recognition-Union Security

A. Recognition: The SMWIA recognizes the Union as the sole and exclusive bargaining agent for all office employees employed at the International Office of the SMWIA, except those employees whose work is of a supervisory nature, personal secretaries to the General President, General Secretary-Treasurer, Office Manager, and House Counsel are not covered by the jurisdiction of the Union.

J.F. Ex 1

exonerated, shall be reinstated without prejudice or loss of seniority and compensated for any loss in wages, including interest to be paid at the current rate per annum, unless the grievance committee or the arbitrator determines otherwise.

D.   When an employee is discharged, suspended, or otherwise disciplined, the employee will be given the reason for such action in writing, with a copy furnished to the Shop Steward, and in the presence of the Shop Steward if requested by the employee.

E.   An employee will have the right to review the employee's personnel file, and upon request can make copies of all materials in the employee's file as long as it is on the employee's own time and in the presence of the Office Manager or the Assistant Office Manager.

## ARTICLE V

### Hours of Work-Overtime

A. Hours of Work - All new hires shall be retained at a five (5) day, forty (40) hour (5/40) work week or a nine (9) day eighty hour (9/80) schedule; with the option to choose a different work week schedule after the completion of one (1) year.

<u>Regular Work Week 5/35</u>

The regular work week shall consist of five (5) seven (7) hour days, Monday through Friday, 35 hours per week exclusive of a thirty (30) minute, forty-five (45), or sixty (60) minute unpaid lunch period. The normal work hours shall be: start time 9:00 a.m. and quitting time 4:30 p.m.

However, employees are able to elect an Alternative Schedule of 5/40, 9/74, or 9/80 shift as follows:

<u>5/40 Work Week</u>

The 5/40 schedule shall consist of five (5) eight (8) hour days, Monday through Friday, forty (40) hours per week exclusive of a thirty (30) minute, forty-five (45), or sixty (60) minute unpaid lunch period. Each employee will have an option of choosing the five/forty (5/40) work week.

8

### 9/74 Work Week

The Bi-weekly 9/74 schedule shall consist of eight (8) eight-and-one-quarter (8.25) hour days, and one (1) eight (8) hour day, for a total of seventy-four (74) hours in two (2) weeks, exclusive of a thirty (30) minute, forty-five (45), or sixty (60) minute unpaid lunch period. Each existing employee will have the option of selecting a Bi-weekly schedule consisting of one (1) five (5) day Monday through Friday work week and one four (4) day work week.

During the four (4) day portion of the bi-weekly schedule, either a Monday, Wednesday or Friday will be designated by the employee as the primary regularly scheduled day off. Employees are free to select Tuesday or Thursday if desired, subject to management's approval.

The Employer shall make all reasonable efforts to schedule the requested day off. In instances where more employees want the same day off other than those available, such days shall be scheduled based on the seniority of the employees.

### 9/80 Work Week

The Bi-weekly 9/80 schedule shall consist of eight (8) nine (9) hour days, and one (1) eight (8) hour day, for eighty (80) hours in two (2) weeks, exclusive of a thirty (30) minute, forty-five (45), or sixty (60) minute unpaid lunch period. Each existing employee will have the option of selecting a Bi-weekly schedule consisting of one (1) five (5) day Monday through Friday work week and one (1) four (4) day work week.

During the four (4) day portion of the bi-weekly schedule, either a Monday, Wednesday or Friday will be designated by the employee as the primary regularly scheduled day off. Employees are free to select Tuesday or Thursday if desired, subject to management's approval.

The Employer shall make all reasonable efforts to schedule the requested day off. In instances where more employees want the same day off other than those available, such days shall be scheduled based on the seniority of the employees.

### Establishment or Change of Hours

The Employee has the option of working a Regular Work Week or an Alternative Shift as described above. Employees will indicate their preference for work hours.

The Employer will then consider those preferences and seniority when establishing

alternative scheduled work hours. However, the Employer will determine the schedule based on departmental needs. Such approval will not be unreasonably withheld and will be based on business necessity.

If a departmental need arises that would require a change in the alternative scheduled work week, back to the regular work schedule, the Employer shall provide ten (10) working days notice to the employee.

### Flexible Shifts

Flexible shifts may be offered to employees in departments where flextime is feasible and mutually agreeable. Employees shall have the option of taking individual breaks to be deducted from their lunch period.

Additionally, the employee may pre-schedule an occasional change in their 9/74 or 9/80 day off in lieu of taking leave. Such change is subject to supervisory approval.

### Starting Times

Employees shall have the option of a quarter hour start time, beginning at 6:00 AM and through 10:00 AM.

### Lunch Hours

The established lunch times of thirty (30), forty-five (45) or sixty (60) minutes can be taken at any time, except the first or last hour of the employee's regularly scheduled work day. The employee's choice is subject to the approval of SMWIA. All covered employees shall use the time clock to punch in and out for work.

### Holidays

If a holiday should fall on an employee's alternative day off, or be granted on the alternative day off, as a result of the holiday falling on a Saturday the employee shall be granted the last scheduled day to work off. (i.e. Friday = Thursday). If a holiday should fall on an employee's alternative day off, or be granted on the alternative day off, as a result of the holiday falling on a Sunday the employee shall be granted the next scheduled day of work off (i.e. Sunday = Tuesday).

Travel

For purposes of travel, an employee who is on a biweekly schedule shall be required to work a regular work week. This shall include the week either prior to, or immediately following the travel period that would have made up the compressed week.

B. Overtime - Time and one-half shall be paid for all work in excess of the regular thirty-five (35) hours per week on the Regular 5/35 hour work week. For all work in excess of the alternative work weeks: forty (40) hours per week on the 5/40 hour work week; or in the case of a bi-weekly 9/74 schedule, in excess of a 41.25 hours per week or in excess of 32.75 hours per work week [depending on which week of the employee's schedule that the overtime is worked]; or in the case of a bi-weekly 9/80 schedule, in excess of a 45 hours per week or in excess of 35 hours per work week [depending on which week of the employee's schedule that the overtime is worked]. Double time shall be paid for Sundays. All overtime shall be computed on fifteen (15) minute increments. In cases of extreme SMWIA business emergency, any or all employees can be required to work overtime, except in proven cases of undue hardship. The work week shall run from Monday through Sunday.

C. Make-up Time - With the prior approval of SMWIA, an employee may be granted up to 2 1/4 hours off with the understanding it will be made up within one week. This time can be made up before an employee's normal scheduled start time or after an employee's scheduled quit time or up to one half of the employees scheduled lunch period. All make-up time shall be submitted to the Office Manager on the appropriate form. If an employee abuses the employee's privilege of make-up time, management reserves the right to withdraw the employee's privilege of make-up time. Make-up time will be allowed for individual tardiness but will not excuse the tardiness.

D. Meal Allowance - An employee working two (2) hours or more beyond the regularly-scheduled quitting time shall be paid a meal allowance of Six and 50/100 Dollars ($6.50).

E. Call In Policy - An employee not reporting for work must call within one-half hour after their normal starting time. Failure to do so will result in the employee being absent without leave and subject to disciplinary action. All tardiness and absenteeism must be reported to the office of the General President or the General Secretary-Treasurer.

F. Differential - Any employee required to perform any work one and one-half (1.5) hours after their normally scheduled quit time, or two (2) hours before their normally scheduled start time shall receive a differential of ten (10%) percent.

## ARTICLE VI

### Holidays

A. The SMWIA shall allow time off for all legal holidays with pay; namely, New Year's Day, Martin Luther King, Jr.'s Birthday, Presidents' Birthday, Good Friday, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans' Day, Thanksgiving Day, the Friday after Thanksgiving Day, the last working day prior to Christmas, Christmas Day, and the last working day prior to New Year's Day. Any of the above-named holidays which fall on a Sunday shall be celebrated the following Monday. Any of the above-named holidays which fall on a Saturday shall be celebrated the preceding Friday. All work performed on holidays shall be compensated at double the employee's regular straight-time hourly rate in addition to his/her holiday pay.

An employee must be in a pay status and not on sick leave (unless a doctor's certificate is provided by the employee) the last working day preceding the holiday and the first working day after the holiday to be entitled to said holiday pay.

## ARTICLE VII

### Compensation Increase

A. Effective October 1, 2006 and each October 1 thereafter, through and including October 1, 2008, there shall be a "Compensation Increase" as defined herein and delegated by Article VII, Article XIV and Article XVI of the current Collective Bargaining Agreement, effective October 1, 2005 through September 30, 2009. After the timely review of the actuarial study by the Trustees and upon review with the Union immediately thereafter, but no later than thirty days prior to the terms of Article VII, Article XIV, and Article XVI for each subsequent compensation increase, the Union shall inform the Employer if there should be a change necessary in the (a)

which leave has been granted.  Employees who comply with these provisions will be guaranteed the return to the job held at the time of taking leave or a comparable job at the same pay level at the time of taking leave.

C.  Vacation and sick leave for the year in which an approved leave of absence occurs shall be prorated.

D.  Employees shall receive sufficient time off without reduction in pay to vote on state and federal election days, provided such time is requested in advance, is taken at the beginning or end of the working day, and the employee is registered to vote.

## ARTICLE XIII

## FUNCTIONS OF MANAGEMENT

A.  The SMWIA shall remain vested with full and exclusive control of the supervision of all operations and the direction of all working forces, including the right to hire, promote, demote, discipline, suspend and discharge employees; to determine the number of its employees; to transfer employees; or to extend or limit any of its operations; or to eliminate any jobs; to determine the work to be performed by each employee; and to make or modify such reasonable rules and policies for the purpose of maintaining order, safety and/or effective operations; except those granted or modified by this Agreement and to require compliance therewith by the employees.

## ARTICLE XIV

## Hospitalization, Surgical and Medical Care

A.  The SMWIA agrees to pay one-hundred percent (100%) of the premium less the deductibles and co-payments for hospitalization, surgical, medical, dental and vision care, along with a life insurance plan for all employees presently employed, and their spouses and dependents, through a carrier selected by the SMWIA or through a fund to be sponsored jointly by the SMWIA, the Stabilization Agreement of the Sheet Metal

Section 2.  Administration and Eligibility

1.  The plan will be administered by four trustees jointly, two selected by the Office Employees' unit and two selected by the SMWIA.

2.  In order to be eligible for retiree health benefits under the Fund, employees must retire directly from their service with SMWIA or be on retiree disability.

3.  In order to be eligible for retiree health benefits under the Fund, employees must be sixty (60) years old and have twenty (20) years of service.

Section 3.  Liability Limited

The SMWIA's liability with respect to retiree health benefits for employees covered by this Agreement and their spouses and dependents is limited to paying the contributions set out in Section 1 of this Section.  The SMWIA shall have no obligation whatsoever to provide or purchase retiree health benefits for such individuals or make contributions in excess of those required under Section 1 of this Section in the event that Fund assets are insufficient either to pay for or subsidize retiree health benefits to current employees, their spouses and their dependents to purchase insurance for that purpose.

## ARTICLE XV

### Grievances

Employees may present grievances either individually or through their Union Shop Committee, excepting wage adjustments, within seven (7) working days in the following manner:

A.  The employee and the Shop Steward shall take up the complaint with the immediate supervisor.  In the event, the complaint is not satisfactorily settled within five (5) working days, then:

B.  The Shop Steward and the Union Representative will discuss the grievance with the Office Manager.  They shall collectively make every reasonable effort to effect a settlement.  If no settlement is reached within five (5) working days, then:

C.  The grievance shall be submitted to the General Secretary-Treasurer of the SMWIA.  If no settlement is reached within five (5) working days, then:

D.  In the event of a dispute or controversy between the SMWIA and the Union arising over the interpretation or application of this Agreement, which cannot be adjusted in the above manner, the point or points in controversy shall be placed in the hands of the Shop Committee and the Staff Representative of the Union for adjustment with the General President and the General Secretary-Treasurer of the SMWIA; all issues to be submitted in writing within five (5) working days.

E.  In the event of failure to reach a satisfactory adjustment of the grievance within five (5) working days, the grievance may be taken to arbitration within thirty (30) days by either of the parties upon notice to the other party.

An impartial arbitrator shall be selected from a panel supplied by the Director of the Federal Mediation and Conciliation Service upon the request of either party.  The parties shall, within five (5) working days of receipt of such panel, make a selection of an arbitrator.  In the event the parties cannot agree, the Director of the Federal Mediation and Conciliation Service shall be petitioned to appoint an arbitrator.  The arbitrator shall have no authority to change, amend, add to, or subtract from any of the provisions of this Agreement.  This arbitrator shall render a decision within thirty (30) days after the case has been heard.  The decision of the arbitrator will be final and binding on both parties.  The arbitrator's fee shall be borne equally by both parties.

## ARTICLE XVI

### Retirement Plan

A.  Effective the date of ratification and monthly  thereafter, the SMWIA will contribute 15% of the payroll of employees covered by this Agreement to the SMWIA Office Employees Pension Fund to provide retirement benefits for eligible employees. Effective October 1, 2006 and monthly thereafter, the SMWIA will contribute 17%

# Exhibit 2

## FEDERAL MEDIATION AND CONCILIATION SERVICE

|  |  |
|---|---|
| Arbitration in the Matter of | ) |
| | ) |
| SHEET METAL WORKERS | ) |
| INTERNATIONAL ASSOCIATION | ) |
| | ) |
| -and- | ) |
| | ) |
| OFFICE & PROFESSIONAL | ) |
| EMPLOYEES INTERNATIONAL | ) |
| UNION, Local 2 | ) |

**OPINION AND AWARD**

FMCS Case No. 06-058502

Alternative Schedule Work Week

### APPEARANCES:

For SMWIA:

Mady Gilson, Esq.
Bredhoff & Kaiser, P.L.L.C.
Washington, DC

Richard G. McCracken, Esq.
Davis, Cowell & Bowe
San Francisco, CA

For OPEIU:

David R. Levinson, Esq.
Attorney At Law
Washington, DC

### INTRODUCTION:

The Sheet Metal Workers International Association ("SMWIA" or "Employers") and the Office & Professional Employees International Union, Local 2 ("OPEIU" or "Employees") are parties to a collective bargaining agreement ("Agreement") concluded on November 10, 2005. Pursuant to Article XV thereof, disputes not settled in grievance handling are subject to binding arbitration.

Although the Agreement incorporates terms permitting employees to select any of four alternative work schedules, on June 20, 2006 the SMWIA announced its intentions to eliminate such schedules and require all employees to revert to the pre-existing regular work weeks.

On July 6, 2006 the OPEIU challenged that action, later filing an unfair labor practice

**OPINION AND AWARD**        **SMWIA & OPEIU Local 2 – Alternative Work Schedules**

charge with the National Labor Relations Board ("NLRB") alleging bad faith bargaining in violation of Section 8(a)(5) of the Act. [1] Following denial of the claim at the third step hearing of the grievance process the OPEIU invoked its right to submit the dispute to arbitration. This Arbitrator was then selected from a panel supplied by the Federal Mediation and Conciliation Service ("FMCS") to hear the case and render a decision.

Hearings were conducted on January 25, June 4 and June 5, 2007 at the law offices of Bredhoff & Kaiser, Washington, DC in accordance with the rules of the FMCS. Neither party raised procedural issues. The first day of hearings was transcribed. All documentary materials received in evidence; the transcript from January 25; the Arbitrator's notes from the second two hearing days; and the parties' post hearing briefs exchanged on August 8, 2007 constitute the record in the matter.

<u>STATEMENT OF ISSUE:</u>

Did the SMWIA violate the Agreement by discontinuing the alternative work schedule arrangements agreed to in November, 2005 and requiring employees to revert back to regular work schedules in June, 2006? If so, what is the appropriate remedy? [2]

<u>RELEVANT CONTRACT TERMS:</u>

**ARTICLE V** – *Hours of Work – Overtime*

"A. Hours of Work – All new hires shall be retained at a five (5) day, forty (40) hour (5/40) work week or a nine (9) day eighty hour (9/80) schedule; with the option to choose a different work week schedule after the completion of one (1) year.

<u>Regular Work Week 5/35</u>

The regular work week shall consist of five (5) seven (7) hour days, Monday through Friday, 35 hours per week exclusive of a thirty (30) minute, forty-five (45), or sixty (60) minute unpaid lunch period. The normal work hours shall be: start time 9:00 a.m. and quitting time 4:30 p.m.

However, employees are able to elect an Alternative Schedule of 5/40, 9/74, or 9/80 shift as follows:

<u>5/40 Work Week</u>

(*Descriptive language omitted.*) Each employee will have an option of

---

[1] The record reflects that the NLRB has deferred processing the charge pending the conclusion of arbitration.
[2] We reject the OPEIU's formulation of the issue to include the 8(a)(5) bad faith bargaining allegations. Those issues are beyond the jurisdiction of the Arbitrator.

2

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

choosing the five/forty (5/40) work week.

## 9/74 Work Week

(*Descriptive language omitted.*) Each existing employee will have the option of selecting a Bi-weekly schedule consisting of one (1) five (5) day Monday through Friday work week and one four (4) day work week.

During the four (4) day portion of the bi-weekly schedule, either a Monday, Wednesday or Friday will be designated by the employee as the primary regularly scheduled day off. Employees are free to select Tuesday or Thursday if desired, subject to management's approval.

The employer shall make all reasonable efforts to schedule the requested day off. In instances where more employees want the same day off other than those available, such days shall be scheduled based on the seniority of the employees.

## 9/80 Work Week

(*Descriptive language omitted.*) Each existing employee will have the option of selecting a Bi-weekly schedule consisting of one (1) five day Monday through Friday work week and one (1) four (4) day work week.

During the four (4) day portion of the bi-weekly schedule, either a Monday, Wednesday or Friday will be designated by the employee as the primary regularly scheduled day off. Employees are free to select Tuesday or Thursday if desired, subject to management's approval.

The employer shall make all reasonable efforts to schedule the requested day off. In instances where more employees want the same day off other than those available, such days shall be scheduled based on the seniority of the employees.

## Establishment Or Change of Hours

The Employee has the option of working a Regular Work Week or an Alternative Shift as described above. Employees will indicate their preferences for work hours. The Employer will then consider those preferences and seniority when establishing alternative scheduled work hours. However, the Employer will determine the schedule based on departmental needs. Such approval will not be unreasonably withheld and will be based on business necessity.

If a departmental need arises that would require a change in the alternative scheduled work week, back to the regular work schedule, the Employer shall provide ten (10) working days notice to the employee.

## Flexible Shifts

Flexible shifts may be offered to employees in departments where flextime

OPINION AND AWARD       SMWIA & OPEIU Local 2 – Alternative Work Schedules

is feasible and mutually agreeable. Employees shall have the option of taking individual breaks to be deducted from their lunch period.

Additionally, the employee may pre-schedule an occasional change in their 9/74 or 9/80 day off in lieu of taking leave. Such change is subject to supervisory approval.

<u>Starting Times</u>

Employees shall have the option of a quarter hour start time, beginning at 6:00 AM and through 10:00 AM."

## ARTICLE XIII – *Functions of Management*

"A. The SMWIA shall remain vested with full and exclusive control of the supervision of all operations and the direction of all working forces, including the right to hire, promote, demote, discipline, suspend and discharge employees; to determine the number of its employees; to transfer employees; or to extend or limit any of its operations; or to eliminate any jobs; to determine the work to be performed by each employee; and to make or modify such reasonable rules and policies for the purpose of maintaining order, safety and/or effective operations; except those granted or modified by this Agreement and to require compliance therewith by the employees."

## BACKGROUND FACTS

The record reflects that the employer union, headquartered in Washington, DC, represents some 150,000 members working chiefly in the HVAC construction, metal products and related industries. It employed a total staff of about 70 people during the period in which this dispute arose, a substantial number of whom held field assignments. Approximately 23 employees occupying support staff positions in the Union's Washington offices processed dues payments and performed other clerical and administrative tasks in accounting, mailroom, receptionist and secretarial positions. All were represented by OPEIU, Local 2.

A series of prior agreements between the parties dating back to at least 1993, including the predecessor agreement running through September 30, 2005, had made provision for "flex-time" schedules allowing employees to start and end their work days within specified hourly ranges. When bargaining for a new Agreement commenced in the fall of 2005, however, the employer offered up a series of proposals aimed at, *inter alia,* eliminating unproductive time and thereby expanding service to SMWIA locals. After some back and forth, on November 10, 2005 a new Agreement was concluded in which  Local 2  agreed to

4

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

surrender the established 35-hour work week with two paid 15-minute daily breaks in favor of 40-hour work weeks, but with employees allowed to choose any one of four different alternative work schedules in which to complete their weekly work obligations.

Following ratification and implementation of the new Agreement, all 22 unit employees then on payroll were permitted to elect one of the four negotiated optional work patterns. All chose to work more than 35 hours per week, with 10 opting for Fridays off and 8 selecting Mondays. Except for one minor problem, ultimately adjusted, administration of this aspect of the new Agreement was unremarkable until June, 2006, when a conflict arose between the parties over who should absorb the expenses associated with administering the newly negotiated "Flexible Spending Account" benefit. When conferences on those issues failed to produce any resolution, OPEIU threatened to file a grievance.

In the meantime, the employer asserts that declining dues receipts and other financial pressures had stimulated an overall operational assessment in the spring of 2006. Based upon its analysis, it determined that the adoption of alternative work schedules had not generated the productivity improvements it had anticipated. Consequently, on June 20, 2006 newly appointed SMWIA General Secretary-Treasurer Joseph Nigro announced that all employees would revert to their regular 35-hour work weeks effective July 31, 2006. His announcement read in part:

> "This letter is to officially give you notice that due to departmental and business needs, any and all alternative work schedules will cease at the end of the work day on Friday, July 28, 2006. All collective bargaining unit members will return to a regular 5/35-work schedule effective Monday, July 31, 2006. Our notice fulfills the 10-day prior notice to employees as stipulated under Article V, Hours of Work-Overtime, paragraph titled, Establishment or Change of Hours..."

When the OPEIU's grievance dated July 6 remained unsettled following third step hearing, this arbitration ensued.

POSITIONS OF THE PARTIES:

The Employer

The SMWIA has fully complied with each and every obligation it undertook in the new contract. The grievance accordingly must be denied.

5

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

Article V gives the employer the right to return employees to their regular work schedules if it concludes that the needs of the service so require. In this instance the record amply demonstrates that legitimate and compelling business reasons dictated more conventional work schedules. Consequently, there can be no principled basis upon which to find a violation of the Agreement.

As the record clearly reflects, upon becoming General Secretary-Treasurer in February, 2006, Mr. Nigro began to focus immediately on the SMWIA's operational and staffing needs with an eye to getting the international's operations back on a solid financial footing. Under express directives from the General President to cut expenses, Nigro began reducing or eliminating various costs, including those related to rental cars and weekend trips home for employees working in the field. Staffing levels were reviewed and vacant positions were left unfilled. Secretarial staff was realigned to provide for covering with four secretaries a workload previously handled by five people.

When Mr. Nigro turned his attention to employee productivity he concluded that the newly adopted alternative work schedules had added no value. Although employees were working longer work weeks, in departments such as Jurisdiction, where the volume of disputes between crafts had declined, there was no additional work to be done in the expanded hours—and, indeed, insufficient activity to even fill the former 35-hour weeks. As Nigro credibly testified, the changes had also produced several operational problems. Because 19 of the 22 bargaining unit employees had opted to work a 9/74 or 9/80 schedule, each was off every tenth work day, thus losing 26 work days annually over and above already generous leave allowances, including 45 days of vacation, holiday and sick leave for most employees. Alternative work schedules thus translated to 71 days off annually, 27% of the normal work year. Further, on some occasions in April, May and June, 2006, high numbers of bargaining unit employees were seen to be absent on Mondays and Fridays— half of the workforce was absent on Thursday, April 13, the day prior to the Good Friday holiday, a day when no employee was scheduled to be off. With few employees choosing to work beyond 4:30 p.m., the hoped-for extended coverage to service locals in the Midwest and West never developed. Additionally, since the work of most employees is job specific, when employees were absent, the work of their positions piled up until they returned,

6

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

creating unnecessary delays. In the Membership Department, receipts processed both in total and on a per-employee basis had declined in the first five full months of working the expanded hours, indicating to Mr. Nigro that although the SMWIA was paying employees for a longer work week there was no concomitant increase in productivity.

The record is accordingly clear that in directing its employees to revert to the regular 35-hour work week, the employer was motivated by legitimate operational considerations as permitted under Article V, whose terms make flexible shifts contingent upon mutual agreement between employee and employer and allow changes when department needs arise. SMWIA's conclusion that there was no longer any benefit in having support staff come in early before their managers were in or the locals were open and then leave while those managers were still at work was amply supported by legitimate business reasons.

The OPEIU bears the burden of establishing the asserted violation. It has failed to carry that burden. The evidence demonstrates that the employer's decision to end the alternative schedules on grounds that they were not in its best business interests did not offend the Agreement.

The Employees

There are multiple reasons why the employer's elimination of alternative schedules announced June 20 and implemented July 31, 2006 violated the governing CBA. The grievance has merit and the employees are due a remedy.

First, a fair reading of the Agreement language, without more, supports the OPEIU's position that the employer's action was inconsistent with its contractual obligations. The Agreement employs several terms relating to the issues in dispute: (i) the pre-existing language of Article V applicable to "Flexible Shifts," carried forward unchanged without discussion and stating that such shifts are available where "feasible and mutually agreeable;" and, (ii) the new language related to the alternative work schedules, which does not leave the initial selection of such schedules to management but sets forth two standards for how they are established and changed. Initially they will be based on "departmental needs," but "approval will not be unreasonably withheld and will be based on business necessity." Plainly, the Agreement allows for changes in established alternative schedules only, "if a departmental need arises which would require a change." Both clauses were

7

**OPINION AND AWARD**          **SMWIA & OPEIU Local 2 – Alternative Work Schedules**

treated together in bargaining and should be read together. But if only the phrase, "if a departmental need arises," the narrowest reading, is applied to the changes in dispute, it is clear that the employer has not demonstrated such need.

Strong support for the proposition that SMWIA's rescission of the disputed schedules violated the Agreement can be found in the bargaining history leading up to adoption of the new benefits, the retaliatory events occurring immediately thereafter and the contradictory and inconsistent positions the employer has taken in its futile attempts to demonstrate genuine business necessity for these changes. With respect to the negotiations, it was the employer that proposed going to a uniform 40 hour work week and eliminating the paid break/lunch times. The OPEIU resisted, but ultimately was receptive to the notion provided employees had the option of doing their work under alternative schedules of their choosing. For that flexibility, and in return for an overall acceptable package of economic improvements, they surrendered their paid break/lunch time. The SMWIA now seeks to retain the benefits of the bargain it gained, but negate the OPEIU's wins--the additional hourly pay, the enhanced flexibility of working schedules tailored to employee needs and the incidental aid to pension funding flowing from additional hours worked.  supersede

During negotiations, SMWIA negotiator Tom Kelly expressed the view that the employer needed to retain the ability to change schedules in the event of unforeseen developments. Specific examples of such circumstances were discussed: the employer's convention; emergencies arising from natural disasters; another hostile terrorist attack. From that discussion the language of Article V emerged allowing for modifications to alternative schedules, "if a departmental need arises that would require a change." But Mr. Kelly was clear in stating that he did not intend that the employer could ever revert to uniform and limited scheduling. The changes made offend those understandings.

The events occurring thereafter are also telling with respect to the parties' intended meaning. Following ratification, all unit employees chose one of the new alternative schedules. Two went with the 5/40 work week; all others chose one of the two compressed work week schedules. The alternative work schedules worked without a hitch aside from one insignificant blip in the system when, in January, 2006, as employees were adjusting to the new schedules, management was required to remind those on non-work time to avoid

8

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

distracting co-workers. Effective March 1, however, Secretary Treasurer Tom Kelly resigned his position over issues with Employer President Michael Sullivan. Later that month, Office Manager Bishop was dismissed and Sullivan's former Assistant, Joseph Nigro, was named to replace Kelly. In April the employer then hired new office Manager Pat Emblem.

For a time, the alternative schedules continued to function as intended. In April, 2006, Nigro met with Local 2 Rep Linda Bridges and Chief Steward Brian Sullivan to discuss, among other issues, Nigro's request that the Local work with Ms. Emblem in an effort to reduce the number of employees taking their compressed schedule days off on Fridays or Mondays. OPEIU responded appropriately, and sometime in early May the parties agreed that no more than half the employees in a given area could be off on any given day except for unplanned eventualities such as sick or emergency leave.

Another dispute, however, then arose: whether the OPEIU or the SMWIA would absorb the costs of administering the newly negotiated Flexible Spending Accounts allowing employees to designate pre-tax dollars from their pay to cover certain categories of expenses. With no resolution of that matter in sight, on June 9 Steward Brian Sullivan told Ms. Emblem that Local 2 would be grieving the matter.

Shortly thereafter, Emblem met with Steward Sullivan and announced that employees would no longer be allowed to eat or drink at their desks. On June 20 the employer then announced the elimination of the alternative work schedules based on unspecified "departmental and business needs," notwithstanding that Ms. Emblem had never raised previous concerns about the operation of the schedules.

Beyond the bargaining history and obvious retaliatory motives in play here, Mr. Nigro's explanations and those of President Sullivan for SMWIA's actions have been varied, internally inconsistent and unsupported by any factual documentation. Both men assert that the decision was predicated upon financial need, with Sullivan specifically citing a drop in membership. BNA data, however, reflects a slight increase in SMWIA membership in 2005 and 2006. Ms. Emblem testified that at the time of hearing membership was 149,600. That represents an increase of more than 5000 from the 2006 BNA reports. Additionally, revenues were also up significantly as a result of an increase in

9

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

per capita dues in the year prior to new Agreement, a hike set to continue in place through the next five years. Further, although the employer announced "department and business needs" as its reasons for acting, it has never identified, either in grievance handling or in this proceeding, any departmental needs other than in the Membership unit, in support of its argument. Indeed, in the grievance process it cited the fact that employees were not at their desks every day. Nor has it ever explained why it could not have taken the issue into consideration on a less aggressive basis, department by department, except to state that it could not address individual employee needs for fear that unequal treatment of employees might lead to grievances from the OPEIU over such exceptions.

Despite the employer's assertions, the record here contains no evidence whatsoever as to business necessity reasons applicable to departments other than Membership. And the testimony of OPEIU witnesses demonstrates that as to that department, the employer's evidence of financial hardship is unreliable at best. While SMWIA insists that the increased hours did not produce increased dues processing in this department, as those employees most familiar with the work performed in that unit testified, the numbers produced on management's summaries are solely attributable to the volume of dues reports arriving from the locals. Dues receipts vary from month to month because some locals combine and send in several months at a time, and others are chronically inaccurate. Thus, monthly fluctuations in individual processing rates shown before and after alternative schedules were adopted are not an appropriate measure of employee productivity.

Accordingly, the real explanation for the employer's decision lies not in "financial necessity," but in the response Joseph Nigro gave to unit members when asked why he eliminated the disputed schedules: "because he could." And if further proof of the prevailing contemptuous attitude were required, one need only to consider this: in January, 2007 the employer announced its intention to contract out the work of its largest department—Membership.

The OPEIU has provided persuasive evidence of significant employee hardship flowing from this breach of the Agreement. Nancy Johnson testified that the 9/74 schedule had allowed her to forego using sick leave for treatment of chronic medical problems and that its elimination created financial hardship. Serena Holland says the new alternative

10

**OPINION AND AWARD**                **SMWIA & OPEIU Local 2 – Alternative Work Schedules**

schedules had allowed her to reduce her commute time and aided with child care and medical appointments. Leah Atkins, suffering from seizures and unable to drive, has lost her ability to carpool. Patty Shoap stated that the flexible schedule enabled her to get the treatments she needs for a chronicle medical condition without using sick leave.

Lastly, the employer predicated its need for alternative schedules on a desire to increase services to its members by expanding hours of availability. Those priorities have now apparently changed under new SMWIA leadership. But such a re-ranking of priorities is not tantamount to a "departmental need requiring a change."

Local 2 estimated the cost of the paid lunch/break time it relinquished as 3% of payroll. It was a significant give-back, offset by the greater earnings from the expanded work week for hourly employees and beneficial impact on pension plan funding. So the new work schedules were a valuable benefit resulting from the 2005 contract, a key element of an overall balanced package of economic contract terms. Their elimination, and the elimination of the more limited flexible schedules that had existed since 1993, was a serious blow to the bargaining unit. It is treatment explainable solely in terms of a deep underlying animosity toward these employees. SMWIA acted in bad faith, to retaliate and penalize, and those actions should not go unpunished.

**OPINION:**

There is a lot going on here, plentiful action both on stage and in the wings.

The OPEIU asserts a number of equity arguments, stressing employee hardship and emphasizing that it would be an injustice to them and a windfall for the employer to sanction cancellation of a benefit so central to the deal. It convincingly demonstrates that the changes made were inconvenient for employees and discouraging for their bargaining committee. But none of these things are relevant if the SMWIA had the contractual right to rescind alternative schedules. If that action worked hardships on employees or detracted from the value of the bargain struck, but was not inconsistent with Agreement terms, the ensuing problems are for the parties to work through. And while it is no fun to say so, as a matter of contract interpretation the same is true if the changes were just pinch-minded

11

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

push-back for the positions OPEIU had taken on other fronts.[3] Thus, even if the OPEIU's hypothesis is indulged and the SMWIA was fuming over unrelated issues, that does not disqualify it from exercising rights it may have had under the Agreement, provided its actions met the standards set forth therein. The SMWIA's style may not have been warm and fuzzy; their word choices the wrong ones; their motives impure. In the end it doesn't matter much. The Agreement has the last word.[4]

Agreement language is thus the jumping off point. As an initial matter, the record is clear in establishing that as ultimately adopted it was the product of a joint OPEIU-SMWIA bargaining subcommittee. The OPEIU is thus correct in asserting that no presumptions apply in either direction.

Broadly speaking, it is apparent that the parties established that employees after their first year would have four scheduling options to supplement the already existing flexible shifts which had involved only starting and quitting times, not days worked or number of hours worked:

- **35 hours in 5 days, with normal hours of 9 to 4:30 p.m.**

- **40 hours in five days, without specified starting or quitting times.**

- **Bi-weekly 9/74 schedule providing for a mix of 8 and 8 ¼ hour days totaling 74 hours every two weeks, with one weekday off every other week and no specified starting or quitting times.**

- **Bi-weekly 9/80 schedule providing for a mix of 8 nine-hour days and one eight-hour day, with one weekday off every other week and no specified starting or quitting times.**

---

[3] Bosses, judging from the hot-selling bad-boss tomes, may be getting meaner. In any event, there is good evidence all around of managers with poor people skills, supervisors lost without their "cookbook" manuals, uncivil, sometimes abusive. Nothing in this record supports the inference that SMWIA management fit that mold. At the same time, it is apparent that many OPEIU employees were loyal, long-service personnel, some with serious personal situations that would have benefited from a bit of flexibility on the part of their employer. The notion that those individual circumstances could not have been considered in approving/disapproving shift schedules for fear of grievances is dispiriting.

[4] Beyond the arguable relevance of "hostility" in this context, the theory zooms sideways when it is considered that newly appointed General Secretary Joseph Nigro, a 40-year SMWIA veteran, cut rental car and travel expenses and took other cost-reduction measures that affected employees beyond those represented by Local 2. Either he was willing to take extraordinary steps to mask his animus, a rickety proposition, or he was operating out of genuine concern for conserving costs. (The possibility of subcontracting the work of the Membership department is an issue not developed on this record, and nothing herein should be understood as bearing on that question.)

**OPINION AND AWARD**          **SMWIA & OPEIU Local 2 – Alternative Work Schedules**

Those general aspects of Article V are about as clear as anything gets in English. But whether such shifts, once established, may be modified, and if so, for what reasons, is a is a thornier question.

After first defining the "Regular Work Week" in terms of total number of hours required and range of start/quit times, and without saying how their lunch periods of varying duration are assigned or bid, Article V recites that "employees are able to elect an Alternative Schedule..."although setting no starting or quitting times for any of the 40 hour, 80 hour or 74 hour options. Some redundancy is apparent, with the Agreement reiterating for each option that, "...each employee will have the option of selecting" it. Three qualifications or limitations apply to all: (i) a Monday, Wednesday or Friday must be designated as the primary regularly scheduled off during the 4-day portion of the bi-weekly schedule, (ii) Tuesdays or Thursdays are subject to management's approval, and (iii) seniority will be the tie-breaker if the choices of all employees for the same day cannot be accommodated.

Under "Establishment or Change of Hours," there is more redundancy: "...the employee has the option of working a Regular Work Week or an Alternative Shift as described above." Employee preferences and seniority will receive consideration *when alternative work hours are established,* but neither bids nor seniority are dispositive:

> "However, the employer will determine the schedule based on departmental needs. Such approval will not be unreasonably withheld and will be based upon business necessity." (Emphasis supplied.) [5]

To this point, it is hard not to think that the contractual intent was to give employees the option of working such alternative shifts as the employer determines to make available based on departmental needs. It follows that if the employer decides there is no departmental need for alternative shifts, none need be offered, (or no employees need be authorized to fill those that are created.) Employer approval, based upon its assessment

---

[5] Both sides invoke the business necessity argument in support of their positions, although rules of grammar suggest that the "business necessity" reference here does not qualify the changing of schedules but the employer's approval (or disapproval) of the employees' expressed preferences for them. In the context of the question before us, it likely makes no difference, since in either case the employer's judgment alone drives the outcome. It may choose either to not establish such schedules based on departmental needs or not approve the employees' expressed preferences for them, depending on business necessity.

13

**OPINION AND AWARD**        **SMWIA & OPEIU Local 2 – Alternative Work Schedules**

of need, is critical.

The final sentence of the "Establishment Or Change of Hours" provision simply obligates the employer to provide 10 days advance notice of change to employees. In this instance, that requirement was met with the nearly 5 weeks advance notice of change provided by SMWIA. In addition to timely notice, one other limitation is imposed on the employer in the exercise of those rights: changes must be based on departmental needs.

It is at this juncture that the OPEIU advances an argument that is creative, if intricate. Without serving it up in detail, it may be shorthanded as follows: Alternative shifts are necessarily flexible shifts, since they do not fit within the 9 a.m. to 4:30 pm. hours applicable to the "regular" work week. Flexible shifts under the prior agreement were required to be offered only "in departments where flextime is feasible and mutually agreeable." But the new Agreement language makes Alternative Shifts contingent upon "departmental needs." The Agreement language, therefore, is susceptible of two constructions. There is inherent conflict between the former conditions attaching to flexible schedules and those adopted in 2005 permitting changes in alternative schedules only if departmental needs arise. An important rule of contract construction requires that when contracts are amended the interpreter must construe an intent to change, since the drafters should not be presumed to have engaged in meaningless acts. Accordingly, although alternative schedules overlap flexible shifts, the limitation providing that flexible shifts need only be offered if feasible and mutually agreeable must be read as "superfluous and superseded" as to alternative schedules.

The guideline relied upon is time-honored—if there is conflict between old and new Agreement language, the new should normally be given meaning. But the question draws another serviceable rule of interpretation into play, one mandating that whenever possible, competing or conflicting terms must be reconciled in the first instance. Such an approach seeks to honor the use of all language, giving meaning to all words without negating any. That venerable rule seems to have application here. In our opinion, it is a strained reading of the Agreement to consider the settlement language addressing approval of/changes to alternative shifts as so utterly at odds with prior language regarding flexible shifts as to warrant a finding that the latter was superseded.

14

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

The new language reveals no intention to deprive the SMWIA of the broad rights it enjoys under Article XIII and elsewhere under Article V in this regard. It can be harmonized with the purportedly incompatible language on flexible shifts by a more common-sensible construction. In our opinion, the tests of "feasibility" applicable to flexible shifts and "departmental needs" applicable to alternative shifts are for all practical purposes synonymous. They are roughly the difference between reciting that goods are untaxed or taxed at a zero rate. The two sets of conditions are thus harmlessly redundant, or, to the extent there are substantive differences, for purposes of this case the differences are not material. As to both flexible and alternative schedules, employer assent is required.

That conclusion gains vigor when it is considered that, (i) as noted, other examples of repetition and superfluous language are found throughout the Agreement, in conventional CBA drafting fashion, and (ii) it would be passing strange for the draftsmen to condition flexible shifts on SMWIA approval without doing the same for the more impactful alternative schedules. An employer's surrender of reasonable control over work schedules is idiosyncratic enough that it should not lightly be implied. Said another way, if the negotiators had intended to eliminate or curtail the SMWIA's right to modify alternative schedules as argued, those objectives would have been easily achieved by inserting a sentence in the "Establishment or Change of Hours" terms. The record supports a finding that in memorializing their understanding they neither expressly nor impliedly did so.[6]

Nonetheless, the OPEIU maintains, SMWIA has shown no departmental needs requiring these changes. The most it has done is offer limited evidence regarding the Membership department, and no evidence relating to the mailroom, the accounting depart-

---

[6] The OPEIU offers bargaining history in further support of its reading. No one ever contemplated going back to regular shifts other than for a few narrow exigencies specifically discussed, i.e., employer's convention; natural disasters; another act of terrorism. SMWIA negotiator Tom Kelly, since disaffected, said as much. But we reveal no trade secrets in reminding these sophisticated parties that it is not what the negotiators hope to get or think they are getting that is controlling. The most credible evidence of the intent to allow or prohibit schedule changes is the language the parties adopted to convey their intentions. Only if there is genuine ambiguity in terms is there any reason to poke around in the ashes of who said what to whom in bargaining. Thus, reliance on the verbal representations of OPEIU witnesses as to what Tom Kelly said would lead us into the deep end of the pool. We add only this: although we do not find ambiguity, in the interest of reaching a fully informed judgment, the OPEIU's evidence on point has been considered. While recognizing that no verbal understanding therein could vary express Agreement provisions, it warrants mention that no contemporaneously made bargaining note reflects the restrictive meaning now advanced by the OPEIU.

15

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

ment or the receptionist positions. And even as to Membership, the employer's assertion that the longer work hours had not increased production statistics is incorrect. Not only did they exceed the employer' own average production ratings, those hours are not a valid gauge of work performed. Lastly, even if the alternative schedules did not yield a penny for penny value for the employer, that hardly translates to a departmental need "requiring" a change.

It is true that even though the Agreement speaks of department needs, the data in evidence relative to the employer's financial status is for the most part not department specific. The documentary evidence presented, however, taken together with the testimony of SMWIA's managers, reasonably establishes the fact of the SMWIA's broad financial distress, the lack of any corresponding productivity increase from adoption of expanded hours, and, while perhaps treatable in other ways, some degree of mischief associated with their continuance. For example, notwithstanding that the employer absorbed increased payroll costs, employees did in fact process fewer receipts in the first five full months working the expanded hours than they did in the comparable period in 2005, and those shortfalls are not satisfactorily explained. Additionally, absence patterns were shown to cluster around Monday and Friday off-days. Compounding those problems, other factors, including increased staff use of computers/Blackberries and heightened reliance on project labor agreements had triggered diminished workloads among the secretarial pool and within the Jurisdiction department, raising questions about the economics of continuing to pay for an expanded work week in the face of decreased work needs.

Notwithstanding the employee's reliance on conflicting reports regarding membership, we accept as credible the SMWIA's documented assertions that total membership was in decline, aggravated by an erosion in total dues receipts triggered by a combination of shifts in the composition of the membership and the trades in which members were working.[7] Thus, even though not all departments may have been affected equally, against that threatening background, in the department with the greatest number of covered

---

[7] BNA's "Directory of U. S. Labor Organizations" inexplicably reflects a membership increase of about 3% 2006 over 2005. Mr. Nigro's data, derived from SMWIA records, demonstrated a 2005 membership of 148,193 and a 2006 membership of 147,824. Additionally, the only segment of the membership showing an increase was that comprehending pre-apprentices, who pay flat, nominal dues of $10 monthly.

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

employees, Membership, the credible evidence of record demonstrates decreased productivity. So while the OPEIU argues valiantly, its case is freighted up with classically difficult proof problems—it must offer persuasive evidence that SMWIA had no reasonable basis for, no "need," to modify work hours. It is a case facing long odds. The "department needs" language the negotiators adopted is wonderfully elastic. It cannot fairly be read to require the employer to establish that but for the changes the department would fail.

In sum, given that the SMWIA was, as alleged, operating in a generalized state of financial distress, and recognizing that the employer's individual departments are subordinate units of the larger organization and their interests subsumed within the more comprehensive whole, the employer's actions here must be found have reasonably met the governing test of "departmental need."

For the reasons stated above, we reject the OPEIU's view that the SMWIA violated the Agreement by requiring employees to revert back to their former 35-40 hour shift arrangements, decline to reach the charge of bad faith bargaining, and deny the grievance.

A W A R D

The Grievance is denied.

James E. Conway
James E. Conway
Arbitrator

Dated: August 26, 2007
Great Falls, VA

17

Exhibit 3

BEFORE
ARBITRATOR JAMES E. CONWAY

| | |
|---|---|
| In the Matter of ) | |
| ) | |
| OFFICE AND PROFESSIONAL EMPLOYEES ) | |
| INTERNATIONAL UNION, LOCAL 2, AFL-CIO ) | |
| ) | |
| and ) | FMCS No. 06-58502 |
| ) | Hours of Work Grievance |
| SHEET METAL WORKERS INTERNATIONAL ) | |
| ASSOCIATION, AFL-CIO ) | |
| _____) | |

## SMWIA'S POST-HEARING BRIEF

On July 6, 2006, Office and Professional Employees International Union, Local 2 ("Local 2" or "OPEIU") filed a grievance against the Sheet Metal Workers International Association ("SMWIA" or "International Association"), alleging that SMWIA violated the collective bargaining agreement when it invoked Article V of the contract and returned all employees to a regular 35-hour work week, with uniform work hours. Local 2 contends that under Article V, SMWIA was required to continue to allow employees both to work the number of hours they chose (between 35 and 40 per week) and to choose their work schedules, regardless of SMWIA's business needs. An arbitration hearing was held on January 25, June 4 and June 5, 2007, and at Local 2's initiation, the parties agreed to submit post-hearing briefs.

## I. THE ISSUE

At the hearing, the parties did not agree on a statement of the issue. In SMWIA's view, the issue is:

Did SMWIA violate the collective bargaining agreement when it changed the alternative scheduled work week back to the regular work schedule and returned employees to normal work hours?

Tr.[1] 9.[2]

## II. THE FACTS[3]

### A.    General Background

SMWIA is an international union representing approximately 150,000 members who work primarily in HVAC construction, production of metal products, and other industries. Its two National Officers are the General President, who at all relevant times has been Michael Sullivan, and a General Secretary-Treasurer ("GST"). The GST who negotiated the contract provisions at issue in this case was Thomas Kelly; since February 2006, the GST has been Joseph Nigro.

In order to represent its current members and to organize new members, SMWIA has a staff of approximately 70, a good proportion of whom work in the field. Those who work at the Washington, D.C. headquarters include support staff in a bargaining unit represented by Local 2. At the time the current contract was negotiated, there were 23 bargaining unit employees.

---

[1]  There was a transcript of the first day of hearing, and references are cited in this brief as "Tr. ___."

[2]  This formulation of the issue is more precise than the one SMWIA suggested at the hearing. Local 2's proposed statement of the issue was whether "the employer violated the employment agreement and/or did the employer bargain in bad faith by its June 20 change in employee work schedules." Tr. 9. As SMWIA noted at the hearing, while there was no bad faith bargaining, to the extent Local 2 has made such a claim, it is not properly before the arbitrator. His authority is limited to interpreting the contract. Local 2 implicitly recognized this, and filed an unfair labor practice charge with the National Labor Relations Board ("NLRB") alleging bad faith bargaining in violation of Section 8(a)(5) of the National Labor Relations Act. The NLRB has administratively deferred processing the charge pending the conclusion of the arbitration process.

[3]  There was no transcript of the second and third days of hearing, and the recitation of facts based on the evidence presented during those two days is based on counsel's best recollection. Obviously, to the extent the Arbitrator's recollection differs, his controls.

SMWIA and Local 2 have had a long series of collective bargaining agreements. The grievance arose under the current contract, which is effective from October 1, 2005 through September 30, 2009. Jt. Ex. 1.[4]

The contract contains a broad managements' rights clause, Article XIII – Functions of Management:

> A.  The SMWIA shall remain vested with full and exclusive control of the supervision of all operations and the direction of all working forces, including the right to hire, promote, demote, discipline, suspend and discharge employees; to determine the number of its employees; to transfer employees; or to extend or limit any of its operations; or to eliminate any jobs; to determine the work to be performed by each employee; and to make or modify such reasonable rules and policies for the purpose of maintaining order, safety and/or effective operations; except those granted or modified by this Agreement and to require compliance therewith by the employees.

Jt. Ex. 1 at 17.

## B.    The 2001-2005 Contract

The contract that was effective from October 1, 2001 through September 30, 2005 was an extremely generous one.  Salaries were substantial, especially given the fact that employees only worked 32½ hours a week (a standard 35-hour work week that included two paid 15-minute breaks each day).  SMWIA Ex. 5 at 7.  In addition, benefits were rich, and included a defined benefit pension plan, a 401(k) plan, and a Voluntary Employee Beneficiary Association ("VEBA") which provides retiree health benefits for bargaining unit staff.  Extraordinarily, the total benefit costs for the bargaining unit were running an average 82.97% of the cost of salary. SMWIA Ex. 27.[5]  Thus, for example, employee Rebel Gilliom's salary was $47,644.  When

---

[4] As used in this brief, "Jt. Ex." refers to Joint Exhibits, "OPEIU Ex." refers to Local 2's exhibits, and "SMWIA Ex." refers to SMWIA's exhibits.

[5] The components of this were 401(k) contributions, health benefits, post-retirement health benefits, railroad retirement taxes, railroad unemployment compensation, group life insurance, and pension contributions.  *See id.*

pension contributions, insurance and taxes were added to the salary, the total cost for that one

employee was $87,587 – a roll up cost of 83.84%. *Id.* (The roll-ups for employees, depending

on salary and benefits, ranged from 62.18% to as high as 94.41%. *Id.*) As Comptroller David

Darcey explained at the hearing, pension and retiree health care costs are rising, and increased

healthcare costs are "eating [SMWIA] alive."

In addition, employees were (and still are, under the current contract) entitled to very

significant amounts of paid time off that include 20 days of vacation per year for employees with

ten or more years of service, SMWIA Ex. 5 at 10 (all but three bargaining unit employees as of

January 1, 2006 were at that accrual level, SMWIA Ex. 11), 12 days of sick leave, which can be

carried over up to 90 days, SMWIA Ex. 5 at 11, and 13 paid holidays, *id.* at 8, as well as other

forms of leave including bereavement leave, *id.* at 12, and jury duty leave, *id.* Furthermore, with

prior SMWIA approval, every week an employee may be granted up to 2¼ hours off "with the

understanding it will be made up within one week." Article V.C, OPEIU Ex. 1 at second page;

Jt. Ex. 1 at 10. This time can be used, for example, where an employee has a doctor's

appointment during the workday.

C.    **Negotiations for a successor agreement**

1.    Negotiations for the current contract began in October 2005. SMWIA's Chief

Negotiator was General Secretary-Treasurer Thomas Kelly, accompanied by the then-Office

Manager, Kathy Bishop.[6] SMWIA's economic position at the time of the bargaining was not

---

[6] Ms. Bishop's assistant, Jackie Bennett, also was at the table, but as she explained at the
hearing, she simply served as an observer. She played no role in the formulation of
proposals or the drafting of language. Once the alternative work week provision was
negotiated, *see* pp. 6-8, below, Ms. Bennett did the administrative work necessary to
implement it for accounting purposes. *See, e.g.,* SMWIA Ex. 28 (worksheet prepared by
Ms. Bennett).

strong. The International Association had been operating in the red for at least five years, with the following deficits: $4,263,184 in 2001; $7,489,965 in 2002; $4,491,419 in 2003; $10,036,338 in 2004, and $7,156,383 in 2005. SMWIA Ex. 26. The pension plan for OPEIU-represented staff was seriously underfunded, as was the retiree health VEBA. In addition, payroll costs for the bargaining unit were extremely high. *See* SMWIA Ex. 27.

2.    Bargaining began in October 2005, and after only a few sessions, agreement was reached on November 10, 2005. Despite the financial context in which the negotiations were taking place, General Secretary-Treasurer Kelly negotiated a successor agreement that included increased contributions to the pension plan and the VEBA, as well as sizeable wage increases. Under the new agreement, Kelly committed SMWIA to wage increases of 4% in each of the four years of the contract. The contract guaranteed total "compensation increases" of 6%, 6%, 5% and 5% in the four years of the contract, with the excess over wage increases to be used to increase pension contributions and contributions to the VEBA. Jt. Ex. 1 at 11-12.

Inexplicably, Kelly made these contractual commitments without having costed them out[7] or consulted with the General President or SMWIA's Counsel, Patrick Riley, before reaching agreement.[8]

---

[7] While Mr. Kelly testified that he had asked SMWIA Comptroller David Darcey to cost out SMWIA's proposal, Mr. Darcey testified unequivocally that Mr. Kelly never made any such request. Mr. Darcey also unequivocally denied that he had ever told Mr. Kelly that if "we had lost two employees . . . it would pay for the agreement." Tr. 42. Of the two witnesses, Mr. Darcey was the far more credible.

[8] As to failure to consult the latter, Mr. Kelly testified at the hearing that he saw no need to consult. Tr. 128. A contemporaneous email from Kathy Bishop, the then-Office Manager and a political ally of Mr. Kelly's who also was on the SMWIA bargaining team, strongly suggests that Mr. Kelly and she affirmatively wanted to hide from Mr. Riley what was going on in bargaining, presumably because he might report it to the General President. In a fax dated October 14, 2005 to Mr. Kelly, Ms. Bishop wrote, in relevant part: "I said [to Local 2] we would review the Successor Language. I have not

As it turned out, the financial cost of the new contract was high. The cost of salary increases was more than $128,000 in the first year of the contract (based on a combination of the increased number of hours worked and higher pay rates). SMWIA Ex. 27 at 3. While the roll-up for benefits decreased somewhat in the first year of the contract (but was still more than 80% on top of salary), it then increased, and by the end of the contract, will have risen from 82.97% of salary to 84.11% of salary. *Id.* at 4.

      3.    <u>Work Schedule Provisions</u>

      a.    Under the 2001-2005 contract, the work week was 35 hours, with two paid 15-minute breaks per day. Thus, employees worked 32½ hours and were paid for 35. SMWIA Ex. 5 at 7. There also was a separate provision enabling employees to request to work a flexible schedule, that is, to have starting and ending times different from those of the standard work day. The latter provision stated:

> The normal work hours shall be: start time 9:00 a.m. and quitting time 4:30 p.m. Flexible shifts may be offered to employees in departments where flextime is feasible and mutually agreeable.

*Id.*

      b.    In the negotiations, Mr. Kelly proposed that all employees work a 40-hour week. As he explained at the hearing, this proposal was driven primarily by the expectation that having employees in the office more hours per week would result in more work being done and greater service to members. Tr. 39-40 (saw "an opportunity here to expand the hours of operation . . . servicing our locals because we had just went through a major per capital tax increase"); Tr. 41 (agreement on hours was "part and parcel of . . . working together with [Local 2] for more productivity"); Tr. 45 (by having a longer workday, "we're going to really increase

---

shown that to Patrick [Riley] yet because I thought he would want to know about everything else." SMWIA Ex. 12.

productivity"); Tr. 97 ("We were upping our productivity"); Tr. 120 (whether alternative or

flexible schedules, idea was to "have a good relationship with the folks that worked there,

meaning having more productivity"). As Mr. Kelly explained at the hearing, his bottom line

objective was to make sure that the needs of local unions and the members of the SMWIA were

satisfied. Tr. 82.

Secondarily, according to Mr. Kelly, since pension contributions are based directly on

number of hours worked, increased hours would result in greater SMWIA contributions to the

underfunded pension plan.[9] *See* Tr. 43.[10]

Local 2 was unwilling to agree to a mandatory 40-hour work week for current employees.

However, at Local 2's initiation, the parties ultimately agreed that each employee could opt for a

work week ranging from 35 to 40 hours a week, with a compressed work week component. The

following schedules were available:

70 hours every two weeks (35 hours a week);

74 hours every two weeks (average of 37 hours a week) with the employee working 9
days out of 10 with a fixed day off (referred to as a 9/74 schedule);

80 hours every two weeks (40 hours a week) comprised of five 8-hour workdays each
week (referred to as a 5/40 schedule); or

80 hours every two weeks (average of 40 hours a week) with the employee working 9
days out of 10 with a fixed day off (referred to as a 9/80 schedule).

---

[9] This seems counterintuitive, as a major driver of pension costs is salary: the greater the
salary, the greater the immediate cost of employer contributions which are determined as
a percentage of salary, and the greater the benefits the employee will receive upon
retirement (benefit costs the employer must fund).

[10] At the hearing, Local 2 negotiators who testified made no mention of this bargaining
history relating to SMWIA's desire for increased productivity, and instead said only that
members "were willing to work extra hours to help the pension fund" (if they could get
the compressed work week). In the grievance process, Local 2 similarly stated that the
*only* reason Mr. Kelly had wanted more work hours was to increase the pension
contributions. *See* SMWIA Ex. 23.

Article V.A, Jt. Ex. 1 at 7-8.  The parties refer to all but the first option as "alternative

schedules."

In a section captioned "Establishment Or Change of Hours," the parties also negotiated a

procedure by which these schedules were to be implemented:

> The Employee has the option of working a Regular Work Week or an Alternative Shift as
> described above.  Employees will indicate their preference for work hours.  The
> Employer will then consider those preferences and seniority when establishing alternative
> scheduled work hours.  However, the Employer will determine the schedule based on
> departmental needs.  Such approval will not be unreasonably withheld and will be based
> on business necessity.

*Id.* at 8-9.

The newly-negotiated language also included a "safety valve clause" that gave SMWIA

the right to return employees to the regular schedule if business needs warranted:

> If a departmental need arises that would require a change in the alternative scheduled
> work week, back to the regular work week, the Employer shall provide ten (10) working
> days notice to the employee.

*Id.* at 9.  This language had been proposed by Local 2, apparently taken from a contract Local 2

has with another employer, the Associated Third Party Administrators.

**D.**     **Implementation of the Alternative Work Week**

As noted above, agreement was reached on the new contract on November 10, 2005.

Soon thereafter, Ms. Bishop, who reported to Mr. Kelly, began implementation of the new

alternative work week provisions.  She sent a memo to bargaining unit staff informing them of

their option to work one of four schedules:  35-hour work week, 5/40, 9/74, or 9/80.  OPEIU Ex.

7.

Tellingly, neither Mr. Kelly nor Ms. Bishop notified managers of their role in the

process. No summary of the new agreement was distributed, nor were managers told anything about the new work schedule provisions; they learned about them from their staff. In fact, it was not until January 25, 2006, that Mr. Kelly first informed General President Sullivan of the terms of the new contract. Tr. 126; SMWIA Ex. 2.

Thus, for example, as manager Richard McClees explained at the hearing, when the two bargaining unit employees working in his department, Rebel Gilliom and Lonna Bowen, stated they wished to work schedules of 9/80 and 9/74 respectively, SMWIA Ex. 13, he had not been given a copy or summary of the new contract language, and was unaware that he had a right to deny the requests based on business necessity. Instead, Mr. McClees understood only that he could work with the employees in the selection of their fixed day off so that both would not be off on the same day.

In any event, in practice, employees decided how many hours they would work, and every one of the 22 bargaining unit employees on the payroll on January 2, 2006 chose to work more than 35 hours a week. Five elected a 9/80 schedule, 14 opted to work 9/74, and 3 chose the 5/40 schedule. *See* SMWIA Ex. 13. Under the 9/80 and 9/74 schedules, employees had a fixed day off every other week. As of January 2006, the first full month in which the new schedules were implemented, 10 of these employees selected Friday as her day off, and 8 selected Monday. *Id.*

In addition, although the new agreement did not create any enhanced entitlement for employees to work flexible schedules, each employee chose his or her own starting and ending times. *Every* employee chose to begin work before 9:00 a.m., one starting as early as 6:30 a.m., and 16 of the 21 others starting before 8:00 a.m. *Id.* Ending times concomitantly began as early as 3:45 p.m. *Id.*

As Local 2 witnesses explained, this choice of schedule was based exclusively on the personal needs of the employees. Shop steward Brian Sullivan explained that many bargaining unit staff live a significant distance from work, for example, in Southern Maryland, and coming to work very early makes their commute easier. For example, employees have daily roundtrip commutes of 200 miles (Patti Shoap), 130 miles (Leah Hankins, who described herself at the hearing as living "in the middle of nowhere"), OPEIU Ex. 22, approximately 112 miles (Mariza Solomon and Brian Sullivan, who both live in the Fredricksburg area), 92 miles (Deirdre Harash) and 70 miles (Serenia Holland). Other factors in employees' selection of start times included child care (Serenia Holland, Lonna Bowen, Deidre Harash (plus going to her son's school to meet with counselors)), other child-related issues (Leah Hankins), *see* OPEIU Ex. 11, and liking to have a day off to do errands such as going to the Department of Motor Vehicles, the bank and doctors' appointments (Nancy Johnson). Two employees testified more specifically that they liked having a day off every other two weeks because otherwise they would have to use their sick leave or make up time when they were out for doctors' appointments – purposes for which both sick leave and make up time are intended to be used.

Employees began to work the alternative schedules on December 5, 2005.

**E.    Mr. Kelly's Resignation and Ms. Bishop's Departure**

Thomas Kelly resigned as General Secretary-Treasurer effective March 1.[11] As reflected in his February 15, 2006 letter of resignation, there was great political controversy and acrimony between him and General President Sullivan. SMWIA Ex. 4. As a result of her role in

---

[11] The evidence suggested that Mr. Kelly knew well in advance of that date that he would be resigning. At the hearing, he explained that, not surprisingly, while working at headquarters in Washington, he maintained his residence in the Philadelphia area. What was surprising was that he placed his Washington residence on the market for sale in the fall of 2005, Tr. 68, in apparent anticipation of his leaving office and returning to Philadelphia.

distributing Mr. Kelly's resignation letter – which was harshly (and unfairly) critical of General President Sullivan – Office Manager Kathy Bishop was given the choice of retiring or being terminated. She opted for the former, and left the SMWIA in March 2006.

When Mr. Kelly left, Joseph Nigro was appointed as the new General Secretary-Treasurer. Mr. Nigro's history with the union goes back nearly 40 years, and included experience as a Trustee, Vice-President and President of Local 17 in Boston, and almost a dozen years as Business Agent and then Business Manager of the Local. In September of 1999, he became Assistant to the General President, the position he held at the time he was appointed to the General Secretary-Treasurership.

Pat Emblem was hired to replace Kathy Bishop, and began work at the beginning of April 2006. Ms. Emblem fulfills two functions. First, she is responsible for overseeing all bargaining unit staff. Second, she supervises SMWIA's Membership Department, the Department in which the largest number of bargaining unit employees work. The Membership Department's primary role is to processes all dues receipts. As dues are the primary source of SMWIA's income, the efficient and productive functioning of this Department is essential to the operation of the International Association.

**F.    SMWIA's Decision to Return Employees to a Regular Work Schedule**

Upon becoming General Secretary-Treasurer, Mr. Nigro focused attention on the SMWIA's operational and staffing needs, to get the International operating in the black again. As Comptroller David Darcey put it, the mandate from the General President was to keep expenses down. Cuts were made for non-bargaining unit employees in areas such as rental cars, dinners and weekend trips home for those working in the field. In addition, as manager Rich McClees explained, Mr, Nigro asked all department heads to review their budgets and consider

workload in evaluating their staffing. In addition, the SMWIA continued to leave vacancies

unfilled. *See* p. 30, below.

As a result of this analysis and an overall operational assessment, SMWIA made staffing

changes. For example, due to a realignment of department heads and functions, Mr. Nigro

determined that four secretaries – rather than the previous five – were needed to support the

administrative and clerical functions of those departments. Therefore, on April 19, 2006, he

notified the affected secretaries of this:

> Please be advised that effective Monday, May 1, 2006, Secretarial staff will be reassigned
> to best meet the future clerical and administrative needs of each of our departments. This
> realignment of the secretarial staff is with the purpose of maintaining effective
> operations, and will not affect the overall scope of the administrative/clerical duties and
> functions of this classification.

OPEIU Ex. 23.[12]

In addition, General President Sullivan asked Mr. Nigro to see what SMWIA was getting

in return for the cost of the longer work weeks, noting that "the membership pays our bills." In

the months following Mr. Nigro's becoming General Secretary-Treasurer, it became increasingly

clear that there was virtually no value added, and that the alternative work schedules were

operationally problematic.

1.    Under the alternative work schedules, all of the employees who opted to work a

9/74 or 9/80 schedule – 19 of the 22 bargaining unit employees – were off every tenth regular

work day. SMWIA Ex. 13. These 26 days per year were in addition to very generous leave

allowances already enjoyed – 45 days of vacation, holiday and sick leave for most employees.

---

[12] This change did not result in a layoff. Instead, the fifth secretary, Cheryl Frost, was
transferred to the Membership Department. *See* OPEIU Ex. 9. At the hearing, Local 2 tried to
argue that SMWIA's selection of Ms. Frost as the secretary to be reassigned was somehow
impermissible. However, as Office Manager Pat Emblem explained, Ms. Frost had
demonstrated, and been counseled about, attendance problems. *See* SMWIA Ex. 22. In the
Membership Department, closer supervision could be ensured.

*See* p. 4, above. Thus, employees now had 71 days off – 27% of the 260 workdays in a year (52

weeks x 5 days). In addition to the sheer increase in the number of the days employees could be

absent, employees were taking vacation or sick leave on the day before or the day after their

fixed day off, thus extending the number of consecutive work days they were not at work.

Compounding the problem, other employees called in at the last minute to take vacation or sick

leave on days their co-workers had the day off.[13]

These circumstances imposed an operational burden on SMWIA. While some

functions such as running the switchboard could be covered in an employee's absence, most

absent employees' work went undone until the employee returned. For example, two bargaining

unit employees work in the Jurisdiction/Education Departments. As manager Rich McClees

explained without contradiction, much of the work is specific to each position. *See generally,*

SMWIA Exs. 9 and 10 (draft job descriptions). When either of the two employees is absent, the

other does not do much of her colleague's work. In addition, there were days when both were

off and Mr. McClees had difficulty finding a secretary to cover necessary work.[14] Similarly, in

the Membership Department, each employee has her own workload. When an employee is out,

her work generally remains undone until she returns.

---

[13] At Mr. Nigro's direction, Ms. Emblem met with Local 2 to try to address this problem.
Although they agreed that no more than 50% of the employees in a classification could
be out on a given day, *see* OPEIU Ex. 10, the system did not work and the problem
persisted. (This issue first was discussed by the parties shortly after Ms. Emblem arrived,
during an introductory meeting among Mr. Nigro, Ms. Emblem, and Local 2
representatives. At that point in time, Ms. Emblem had been at SMWIA for only a month
and was unaware of the major productivity problems in the Membership Department.
*See* pp. 15-17, below. It was for that reason that the issue was not raised at this initial
meeting.)

[14] Local 2 witness Patti Shoap confirmed that there were days when both Ms. Gilliom and
Ms. Bowen were off.

- 14 -

Ms. Emblem began doing daily emails to staff to alert them as to daily absences.

Looking solely at some Mondays and Fridays in the months of April, May and June 2006, the

number of bargaining unit employee absent – out of a total bargaining unit of 20 or 21 – were

high. For example:

> Thursday, April 13 (the day before Good Friday, a paid holiday under the contract, *see* Article VI.A. Jt. Ex. 1 at 11, and a day on which no employee had a fixed day off): 10 employees – almost half of the bargaining unit – were absent.
>
> Monday, April 17 (the day after the Good Friday-Easter weekend): 7 employees – a third of the bargaining unit – were absent.
>
> Friday, April 21: 5 employees were absent.
>
> Monday, April 24: 7 employees were absent.
>
> Monday, May 8: 5 employees were absent (4 of them in the Membership Department).
>
> Friday May 26: 10 employees were absent (5 on their regular scheduled day off, 5 on sick leave or vacation).
>
> Friday, June 2: 7 employees were absent.
>
> Monday, June 5: 5 employees were absent.
>
> Friday June 16: 8 employees were absent.
>
> Monday, June 19: 6 employees were absent.

SMWIA Ex. 14.[15]

    2.    It also became apparent that despite the fact that every employee was working a

longer work week, there was no increase in productivity. In some departments, such as

Jurisdiction, there was no additional work to be done in the expanded hours. That Department

deals with disputes between crafts, which, if not resolved, are submitted to arbitration. As

former Department Head Rich McClees explained, the work of secretary Rebel Gilliom has

---

[15] More anecdotally, these frequent absences prompted General President Michael Sullivan to express concern to Mr. Nigro.

declined dramatically in recent years. Her primary responsibility was processing disputes. While there were 25 such disputes in 2003 (8 of which went to arbitration), that number declined to 3 in 2004. In 2005, not a single dispute went to arbitration. (This is due to the increased use of project labor agreements.) The jurisdiction dispute secretarial work that has disappeared has not been replaced by other work.

Over recent years, the secretarial work in the department has decreased in other respects as well. Mr. McClees is highly computer literate, and does most of his own correspondence and document production. In addition, all of the International Representatives now have Blackberries, and much correspondence is now by email. Indeed, the secretarial workload has decreased so much that the secretaries suggested to Mr. McClees that he write all of his correspondence in longhand and give it to them to type. Obviously, this work preservation idea made no operational sense.

Thus, not only was there no need for extra hours, but the secretaries in Jurisdiction/ Education did not have enough work to do even for a 32½ hour week. As Mr. McClees explained at the hearing, Ms. Gilliom was looking for more work, and he had talked to both Ms. Gilliom and her co-worker, Lonna Bowen, about the possibility of working part-time elsewhere in SMWIA.

In short, the increase in Ms. Gilliom's hours from 70 to 80 every two weeks was of no operational value; there really was not enough work for her to do in a 35-hour work week, much less in an expanded one.

3.      The department in which the lack of increased productivity was most apparent – and least explicable – was the Membership Department, which is responsible for the SMWIA's financial lifeblood.

Every Audit Clerk Typist in the Department is assigned a number of local unions, and is responsible for "entering" receipts and "processing" receipts. The former consists of entering information into the database about new members, reinstatements, transfers, deaths, changing job classifications, and similar matters. The number of receipts to be entered varies from month to month, and this function occupies a relatively small portion of the employee's time.

The primary role of the employees is to "process" receipts, which involves ensuring that all dues payments are correct and entered properly into the system. Manager Pat Emblem not only kept track of the number of receipts processed each month, but also did month-over-month and year-over-year comparisons. As every employee had opted to work longer hours under the new contract,[16] Ms. Emblem expected to see an increase in productivity. That was not the case, either as to the total number of receipts processed and the average number processed by each employee. For example, comparing total receipts processed in 2005 and 2006 (with six employees working during each year):

|          | 2005    | 2006    |
|----------|---------|---------|
| January  | 128,362 | 131,746 |
| February | 87,260  | 90,066  |
| March    | 112,717 | 122,291 |
| April    | 152,688 | 129,119 |
| May      | 109,430 | 100,210 |

---

[16] As of January 2006, of the 10 employees working in the Membership Department, 7 chose the 9/74 schedule, 1 chose a 5/40 schedule, and 2 chose the 9/80 schedule. SMWIA Ex. 13. Thus, among them, with these schedules and the elimination of the 2½ hours per week in paid breaks, they were working *108 more hours every two weeks* than they had before alternate work schedules were permitted.

OPEIU Ex. 19; SMWIA Ex. 15. Despite the increase in hours worked, employees processed *fewer* receipts in the first full five months of working the expanded hours than they had in the same months in 2005: 573,432 compared with 590,457 (a 3% *decrease)*. Monthly productivity also *decreased*, with an average of only 114,686 receipts processed in 2006 compared with 118,091 in the same months in 2005. *Id.*[17] There similarly was no increased productivity by many individual employees. *Compare* SMWIA Ex. 15 *with* OPEIU Ex. 19.

      4.     Ms. Emblem met regularly with Mr. Nigro to both share these numbers and to discuss the Friday/Monday absence patterns. *See, e.g.,* OPEIU Ex. 16 (referencing the fact that Ms. Emblem was reporting the production numbers to Mr. Nigro). Based on these facts, Mr. Nigro correctly concluded that the alternative schedules simply were not working. Although the SMWIA was paying employees for a longer work week, the pattern of absences resulted in bare coverage on Mondays and Fridays, and despite the increased work hours, there was no concomitant increase in productivity. Indeed, under the new schedules, productivity in the Membership Department had decreased.

---

[17] Local 2 witness Nancy Johnson testified that the number of receipts processed in a given month varies based on the length of time it takes to process the receipts and the pattern of locals' submitting receipts. However, any such fluctuations average out over time, certainly collectively, as well as for each employee. Tellingly, while Ms. Johnson testified that "a reduction in hours means employees can't be there as long to produce," her own work records prove differently. Ms. Johnson's productivity *decreased* significantly from January-May 2005 to January-May 2006, despite the fact that she worked an additional 96.75 hours during the 2006 period. In 2005, she processed 113,981 receipts during those months (a monthly average of 22,796), but only 111,779 (a monthly average of 22,356) during the same period in 2006 when she was working the expanded hours. OPEIU Ex. 19; SMWIA Ex. 15. Furthermore, based on her assessment, including review of comparable dues processing operations at other unions, manager Pat Emblem concluded that audit clerks should be able to process an average of 35,000 receipts a month. She so notified staff in January 2007. *See* SMWIA Ex. 26. In the months that followed, one employee significantly exceeded that goal (Lynn Moreland, processing a monthly average of 50,802 receipts) and Ms. Johnson herself came close to accomplishing it (in fact, processing 54,270 receipts in the last month for which numbers were available.) *See* SMWIA Ex. 19.

Therefore, because of legitimate operational considerations, General Secretary-Treasurer

Nigro invoked the SMWIA's right to have employees revert back to the regular 35-hour work

week, pursuant to Article V, which provides:

> If a departmental need arises that would require a change in the alternative scheduled
> work week, back to the regular work schedule, the Employer shall provide ten (10)
> working days notice to the employee.

Jt. Ex. 1 at 9.  On June 20, 2006, giving employees far more notice than the contract required,

Mr. Nigro informed Local 2 of the change:

> This letter is to officially give you notice that due to departmental and business needs,
> any and all alternative work schedules will cease at the end of the work day on Friday,
> July 28, 2006.  All collective bargaining unit members will return to a regular 5/35-work
> schedule effective Monday, July 31, 2006.  Our notice fulfills the 10-day prior notice to
> employees as stipulated under Article V, Hours of Work-Overtime, paragraph titled,
> Establishment or Change of Hours.
>
> This change will commence with the beginning of a work week; pay cycle; and will give
> employees over 20 working days to make necessary transportation and personal
> arrangements to return to the regular work schedule.  Also be advised that the agreement
> defines the regular work week as follows: *"The regular work week shall consist of five
> (5) seven (7) hour days, Monday through Friday, 35 hours per week exclusive of a thirty
> (30) minute, forty-five (45) or (60) minute unpaid lunch period.  The normal work hours
> shall be:  Start time 9:00 a.m. and quitting time 4:30 p.m."*

Jt. Ex. 3.[18]

5.    During the nearly six weeks before the change was to take effect, a number of

employees asked Mr. Nigro, based solely on personal considerations, to allow them to continue

to work the longer hours and the compressed work schedule.   For example, Karen Olive

complained, without explanation, that elimination of her 9/74 schedule – and having her work

---

[18] As noted in the letter, SMWIA was communicating the change "to all affected
members effective with the date of this letter." *Id.   See, e.g.,* OPEIU Ex. 22 (copy of the
letter given to employees).

every day "will make it impossible to make doctor appointments, etc." OPEIU Ex. 11.[19] Deidre

Harash wanted to continue to have a day off every other week to go to her son's school to meet

with counselors. *Id.* Other employees asked to keep the longer work hours because of the

additional income they were able to earn. *See id.*

Beyond that, as discussed above, most employees had been working flexible hours

(schedules other than the normal 9:00 a.m. to 4:30 p.m. work hours), to deal with the long

commutes most employees have because they live far from the workplace, or for other personal

reasons. *See* pp. 9-10, above. Under Article V of the contract, however, such flexible shifts are

contingent on their being "mutually agreeable." Jt. Ex. 1 at 9. Effective July 31, 2006, SMWIA

no longer was agreeable to such shifts. There was no benefit to the International Association in

having employees start work early, before their managers were in and before locals were open,

and then leave before their managers did and when SMWIA was still open for business.

For example, Dewey Garland, Director of the Railroad and Shipyard Workers

Department, comes in around 9:00 a.m. and stays late. In addition, he typically travels a lot, and

his secretary needs to "hold down the fort." However, the secretary assigned to that Department

in early 2006, Patti Shoap, *see* SMWIA Ex. 8, was working 7:00 a.m. to 3:45 p.m. SMWIA Ex.

13. Therefore, she was at work two hours before her supervisor arrived, and left significantly

before he did. On the many days on which Mr. Garland traveled, Ms. Shoap was gone before the

end of the normal workday and, beginning at 3:45 p.m., unavailable to handle matters.

---

[19] This is difficult to understand, given the large number of sick and vacation days, plus
the 2¼ hours a week of make-up time.

Furthermore, almost no employees were working beyond the normal 4:30 p.m. end of the workday. Therefore, there was no expanded coverage for locals in the Midwest or the West.[20]

As Mr. Nigro explained, a large number of employees had personal reasons why they wanted to work a flexible schedule. However, he was unwilling to pick and choose among the requests and grant a flexible schedule to some but not to others. When he had made exceptions in the past on issues, he later was accused of disparate treatment. (In his words, he feared Local 2 would "hold him hostage," filing time-consuming and expensive grievances to challenge his granting of some flex time requests but not others.) In addition, it was difficult to decide among the personal circumstances employees presented as to which would justify a flexible schedule and which would not. This was especially so because in Mr. Nigro's judgment, what was best for the business of the International Association was to have all employees work the "normal schedule" defined by the contract. He therefore denied all of the requests for flexible shifts.

G.    **The Grievance**

On July 6, 2006, Local 2 grieved the change of work hours, alleging that:

> Employer violated the Agreement by changing employee working hours without a reasonable business necessity or a significant change in underlying circumstances, equitable estoppels; and jeopardized the solvency of the pension plan; and bargained in bad faith.

Jt. Ex. 2.[21] In a grievance meeting, as described by Local 2 Representative Linda Bridges, Mr. Nigro explained that the alternate schedules "were not working," that SMWIA was "not getting

---

[20] The switchboard operator worked until 6:00 p.m., but as Office Manager Pat Emblem explained, there was little need for that late coverage. The volume of calls coming through the switchboard has decreased dramatically, as staff now have direct dial numbers, and many have cell phones and Blackberries through which locals contact them.

[21] At the hearing, Local 2 did not introduce any evidence that the change of hours jeopardized the solvency of the pension plan, and, as a result, that claim must be denied.

additional production."[22]  He noted, too, that the International Association did not need

employees for 40 hours a week.  While making clear that SMWIA was not claiming inability to

pay, Mr. Nigro also expressed concern about its financial situation.  He explained that the union

was operating in the red, and that membership was down.  The lack of increased production was,

in effect, a financial issue.

SMWIA denied the grievance, and this arbitration followed.

At the hearing, Local 2 requested as the remedy the "restoration of the status quo ante,"

that is, that employees be returned to the schedules they had prior to returning to the regular

work schedule implemented by the SMWIA effective July 31, 2007.  (Local 2 has never

requested any monetary remedy.)

### III.  SMWIA'S RETURN OF EMPLOYEES TO THE REGULAR WORK WEEK AND ITS DECISION THAT FLEXIBLE SCHEDULES WERE NOT IN ITS BEST BUSINESS INTEREST DID NOT VIOLATE THE COLLECTIVE BARGAINING AGREEMENT.

In this non-disciplinary case, Local 2 has the burden of proving that SMWIA violated the

contract.  *See, e.g., Archer Daniels Midland Co.*, 111 LA 518, 523 (Pratte, 1998).  As we now

demonstrate, it cannot sustain that burden.  SMWIA was well within its contractual rights to (A)

return employees to a regular work schedule, and (B) no longer agree to flexible work schedules.

---

Similarly, as to the "equitable estoppel" claim, as Local 2 never explained it during the
grievance process nor asserted it at the hearing, it apparently has chosen not to pursue
that claim.  Finally, as to the bad faith bargaining allegation, as discussed above at n. 2,
that issue is not properly before the Arbitrator.

[22] Local 2 requested production numbers for the Membership Department, and SMWIA
provided them.  At the hearing, Local 2 proffered as evidence of SMWIA's bad faith, that
the International Association did not provide requested information as required by the
National Labor Relations Act.  However, it became clear that SMWIA *did* provide the
information it was required to.  *See, e.g.,* OPEIU Exs. 8, 16, SMWIA Ex. 17.  That is
evidenced by the fact that although Local 2 filed an unfair labor practice charge alleging
bad faith bargaining, it did not file a charge alleging that SMWIA had failed to provide
requested information.

- 22 -

## A.    <u>Alternate work schedules</u>

The contract granted SMWIA the right to return employees to the regular work schedule

if business needs warranted.  Article V explicitly provides:

> If a departmental need arises that would require a change in the alternative scheduled
> work week, back to the regular work schedule, the Employer shall provide ten (10)
> working days notice to the employee.

Jt. Ex. 1 at 9.

Thomas Kelly, sponsored by Local 2 as its witness, testified repeatedly that the primary

purpose of allowing employees the option of working longer hours was to increase productivity

and thereby improve service to members (while also affording a benefit to employees).  *See, e.g.,*

Tr. 39; Tr. 40; Tr. 41; Tr. 45; Tr. 97; Tr. 120, discussed at pp. 6-7, above.  By June 2006, it was

abundantly clear that this fundamental operational purpose had not been accomplished.  Some

departments did not have enough work to be done in the expanded work week, *see* pp. 14-15,

above.  Most important, in the department with the largest number of bargaining unit employees

and performing work that is especially essential to the financial health and stability of the

SMWIA, there had actually been a *decrease* in productivity.  See pp. 15-17, above.  Thus, the

SMWIA found itself paying out substantially more in wages, and with an extraordinarily high

roll-up rate of over 80%, and was getting no operational benefit in return.  This was not the

bargain it had made with Local 2.  And, dispositively, the contract did contain a "safety valve"

that allowed the SMWIA to return employees to a regular work week.

At the hearing, Local 2 argued that this "safety valve" was intended to be used only in the

event of a crisis, like a 9/11, a bomb scare, street closures or the like.[23]  Fatal to this claim, the

---

[23] Mr. Kelly's testimony on this issue was confused at best.  At one point, he said that in
bargaining the parties talked about business necessity in the context of a terrorist attack or
disaster that required the closing of the office.  Tr. 80.  When asked if there was any other

contract simply does not say that. Local 2's chief negotiator, Linda Bridges, acknowledged that

she proposed the language. Ms. Bridges is highly experienced in bargaining. Had the clause

been intended to cover only very narrow, temporary circumstances as Local 2 now urges,

surely Local 2 could have drafted such language. But it did not. And as the language was

drafted by Local 2, it should be construed against Local 2. *E.g., Brown 7 Sharpe Mfg. Co.*, 11

LA 229, 233 (Healy, 1948) ("It is an established principle of contract law that since the person

who is doing the writing can, by exactness of expression, more easily prevent mistakes in

meaning than the party with whom he is dealing, the doubts arising from ambiguity of language

should be resolved against the former in favor of the latter"). Moreover, it is telling that neither

the copious bargaining notes taken by Local 2's shop steward, OPEIU Ex. 2,[24] nor any other

bargaining notes reflect such a restrictive meaning.

That the language allowed SMWIA to return employees to a regular work week is

confirmed by the fact that a contrary interpretation would lead to a harsh and nonsensical result.

The very premise of the expanded work hours was to increase productivity. Since it is clear that

there was no such increase, it would be harsh and absurd to interpret Article V in such a way that

requires the SMWIA to continue to pay for hours (and the extraordinarily high benefits that

accompany the increased salary) in which there is no discernible work done.

---

discussion of what business necessity meant besides that, Mr. Kelly responded: "There
was always a general discussion of workload, if we had, for example, had more work
coming in and – that type of thing, if we needed people to be there. It was to fulfill the
needs that we {SMWIA] had . . . That was the point of – when you say about the business
necessity." Tr. 81. At a later point, that Mr. Kelly testified that there was no discussion
that he recalled of the term business necessity as relating to a rationale for eliminating the
alternative work schedules. Tr. 136.

[24] Mr. Sullivan testified that he was taking comprehensive notes, trying "to take down
everything." Tr. 217. He explained that his written bargaining notes, plus the notes he
wrote on proposals, constituted the whole history of bargaining. Tr. 225.

As a matter of basic arbitral principle, such harsh and nonsensical results are to be avoided.

> When one interpretation of an ambiguous contract would lead to harsh, absurd, or nonsensical results, while an alternative interpretation, equally plausible, would lead to just and reasonable results, the latter interpretation will be used.

Elkouri & Elkouri, *How Arbitration Works*, at 470-71 (6th ed. 2003) (footnote omitted). *Accord, e.g., Square D Co.*, 99 LA 879, 882 (Goodstein, 1992) (noting that arbitral awards have held that agreements are to be given a reasonable construction so as to avoid harsh, illogical, or absurd results); *Charley Brothers Co.*, 84 LA 655, 658 (Probst, 1985) (established principle of contract construction that "language should not be interpreted in such a way as to render harsh, absurd or nonsensical results").

Thus, Local 2's claim that the SMWIA can never change employees back to the regular work week on a permanent basis must be rejected as inconsistent with the language of Article V and the bargaining history, and as leading to a harsh result.

At the hearing, Local 2 made a number of arguments in its effort to demonstrate that the SMWIA is contractually required to permanently continue to allow employees to work the extended hours, even if there is no increase (or a decrease) in productivity. Those contentions are unavailing.

1.     First, Local 2 contended explicitly during the grievance process and implicitly during the hearing that "the added hours to schedules were *solely* for [the] purpose of funding OPEIU's pension & RHC [retiree health care.]" SMWIA Ex. 23 (emphasis added). *See also* n. 10, above.[25]   Thus, it argued, productivity was irrelevant. This argument, however, is

---

[25] This position was directly contrary to Mr. Kelly's repeated emphasis on increased production as the driver of the proposal. *See* pp. 6-7, above. Indeed, at one point in the hearing, when asked what the International wanted to accomplish in bargaining, he

fundamentally inconsistent with the testimony of Local 2's witness, Thomas Kelly, who repeatedly explained that the primary driver of SMWIA's interest in expanded hours was to get more work done. *See* Tr. 39; Tr. 40; Tr. 41; Tr. 45; Tr. 97; Tr. 120, discussed at pp. 6-7, above.

2.    Local 2 then disputed that there were any problems at all with the alternate work week. While introducing no evidence that productivity *increased,* it tried to be dismissive of what, in the end, are irrefutable production numbers in the Membership Department showing that production *declined.* For example, it argued that work varies on a month-to-month basis, and, therefore, the only legitimate comparison is year-over-year. But as we have shown, a yearly comparison only reinforces the monthly pattern of *decreased* production. *See* pp. 16-17, above. The total number of receipts processed in 2006 (including the 7 months in which all employees worked extended hours) was 1,293,917, *5½% lower* than the 2005 total of 1,370,841, when employees worked only a 32½ hour week. *See* SMWIA Ex. 18; OPEIU Ex. 19.

3.    Perhaps recognizing these facts, Local 2 also argued that the numbers of receipts processed is not a reliable measure of productivity. The evidence, however, did not support such a claim. Manager Pat Emblem explained that receipts processing is the key duty of staff, and Local 2 made no demonstration of any other substantial work that employees in that department perform. Furthermore, while there may be variations in the level of activity from one month to another, differences in the time it takes to process one receipt over another, and differences for individual audit clerks, those differences average out over time. *See* n. 17, above. Local 2 did not even suggest that there is a year-over-year difference in the work needed to process receipts,

---

responded, "Foremost was that our West Coast locals, to service our West Coast locals, to expand the hours of the operation of the office, which was in conjunction with servicing the West Coast locals and also to eliminate the paid lunch period." Tr. at 38. (As to the latter, Mr. Kelly later explained, "Lunch was 130 hours we were paying a year with no productivity." Tr. 40.)

and made no effort to try to explain the fact that the number of receipts processed in 2006 was less than in 2005. Thus, the number of receipts processed is, in fact, an objective and accurate measure of productivity. And based on that measure, SMWIA was, in fact, getting *less* work done with employees working the expanded, alternative work schedules.

4.    Finally, Local 2 contended that Mr. Nigro's references during a grievance meeting to financial considerations indicated that SMWIA's true motivation was something other than operational concerns. But business needs and financial burdens are two sides of the same coin. As SMWIA Counsel Patrick Riley explained during the grievance meeting, SMWIA gives priority to both, with business necessity being "a lot broader than the financial aspect." SMWIA Ex. 23. Paying employees for significantly more hours for less productivity was a major problem, whether the word used to describe it was "operational" or "financial;" it was both operationally and financially detrimental to SMWIA.

**B.    Flexible shifts**

The contract is explicit that an employee's working a flexible shift, with starting and ending times different from the normal workday – "start time 9:00 a.m. and quitting time 4:30 p.m.," Jt. Ex. 1 at 7 – is contingent on SMWIA agreement:

> Flexible shifts may be offered to employees in departments where flextime is feasible and mutually agreeable.

*Id.* at 9. Effective July 31, 2006, SMWIA exercised its right to withdraw its agreement for the flexible schedules that employees worked. That action was based on the fact that scheduling had evolved to the point that *every* employee was beginning her or his work day before 9:00 a.m., with one starting as early as 6:30 a.m., and 16 of the 21 others starting before 8:00 a.m. SMWIA Ex. 13. Not one bargaining unit employee worked the "normal work hours" specified in the

contract: 9:00 a.m. to 4:30 p.m., the hours during which the International Association is open for business.

Moreover, most employees were working without supervision in the early morning hours, as most managers begin work around the normal starting time.[26] In addition, Local 2's argument that there was a benefit to having employees available to answer early phone calls was refuted by Department Director Rich McClees, who testified that the Jurisdiction and Education Departments typically did not get phone calls until 9:00 or 10:00 a.m. And certainly west coast locals were ill served when most staff was gone by 12:45 or 1:00 p.m. west coast time.

Therefore, General Secretary-Treasurer Nigro concluded that these flexible shifts were no longer agreeable to SMWIA. Moreover, given the fact that every single employee had requested a flexible shift – and many shared the same reasons for wanting to come to work before normal business hours, for example, very long commutes or day care or other child-related needs – Mr. Nigro did not want to be in the position of having to pick and choose as to whose reasons were more compelling than others. He concluded that the most equitable approach was to require all employees to work the contractually-specific "normal work hours."

In support of its claim that SMWIA had no right to do that, Local 2 argues that until this case, SMWIA always granted flexible shift requests. Even assuming for argument's sake that that were true, the fact that SMWIA had been exceptionally accommodating to the considerable personal needs of employees in the past[27] did not somehow establish employees' entitlement to

---

[26] While some managers initially approved the flexible schedules, some, like Mr. McClees, had not been told they had the right to reject the proposed schedules. In addition, staff work not just for a particular supervisor, but for SMWIA. SMWIA has the right to make a judgment as to what works organization-wide.

[27] For example, SMWIA agreed that Leah Hankins could work a variety of schedules, beginning in late 1993: 8:30 a.m. to 4:00 p.m. "due to available hours of daycare in Warrenton;" 8:00 a.m.

"non-normal" work hours. This is especially so given the clear, unambiguous language in Article V: flexible shifts will be offered where "mutually agreeable." Moreover, this very argument substantiates Mr. Nigro's perception of SMWIA's relationship with Local 2: do something to accommodate an employee and Local 2 later will turn it against you (a variation on the theme of no good deed goes unpunished).

Finally, SMWIA is not unsympathetic to the personal needs of its employees, whether stemming from the fact they live as far as 100 miles away from the office, family problems or day care issues. But those personal considerations cannot somehow trump SMWIA's responsibility to run its business and to steward its member-provided resources. Stated differently, work schedules must be dictated by SMWIA's operations, not by the personal needs of staff. As Mr. Kelly himself acknowledged:

> What we said is we want to fit everybody's needs in here; but at the same time, our need has to be met. We couldn't have somebody stamping their feet, if you will, because we couldn't meet their needs. That's why we said we wanted approval of [starting and ending times].

Tr. 48-49. A contrary requirement would be fundamentally unsound as a business principle and nonsensical as a matter of contract interpretation.\

## C.    Allegations of anti-union animus

As to both the alternative work week and the flexible hours issues, Local 2 tried to get out from under the legitimate business concerns that drove both decisions by arguing that the

---

to 3:30 pm because she had a 130 mile roundtrip commute from Amisville, Virginia and her husband's work schedule; 7:30 a.m. to 3:00 p.m. because of an ill child. In addition, for a year, Ms. Hankins was allowed to work from 6:30 a.m. to 2:00 p.m. one day a week for a year to accommodate her son's receiving allergy shots. When alternative schedules were available, she worked 6:15 a.m. to 4:00 p.m., due to the commuting issues that arose as a result of her living so far from the office. OPEIU Exs. 22, 20.

SMWIA was acting out of union animus rather than for sound operational reasons.  That was not the case, and the theories advanced by Local 2 did not prove otherwise.

1.      Local 2 contends, somewhat inexplicably, that the SMWIA's decision to return employees to the regular work week and to normal hours was in retaliation for Local 2's filing a grievance involving who was to pay the administrative costs of a new Flexible Spending Account ("FSA") program negotiated in the current contract.  *See* SMWIA Ex. 20.[28]  Local 2 also filed a grievance concerning employees' eating at their desks.  *See* SMWIA Ex. 21.  But neither of those grievances was filed until July 6, 2006, weeks *after* Mr. Nigro announced on June 20 that the hours of work were being changed.

This being an incontrovertible fact, Local 2 was reduced to arguing that Shop Steward Brian Sullivan mentioned to Office Manager Pat Emblem in early June 2006 that the union intended to grieve the FSA dispute.  (He made no such claim as to the eating grievance.)  However, as Ms. Emblem explained, that was of no great significance to her; Mr. Sullivan was always telling her he was going to file grievances.  Moreover, there was no evidence that Ms. Emblem passed the information along to Mr. Nigro, the decision-maker in this case.  And even if she had, as Mr. Nigro explained, as a long-time union leader he understands that unions file grievances as part of representing members; he would expect Local 2 to do so, as that is what unions do.  Far from engendering a desire to retaliate, Local 2's filing a grievance on the FSA or any other issue would simply be handled in due course.  Ironically, Mr. Nigro told Local 2 that

---

[28] Local 2 alleged: "Employer failed to implement the employee FSA accounts in a timely manner, and continues to fail to administer the plan; Employer has established a cost prohibitive barrier to participation in the plan and threatened to lay off Union members if forced to pay for the plan."  SMWIA Ex. 20.  This latter allegation was raised by Local 2 in the instant hearing as well.  Notably, the decision in the FSA case makes no reference to that claim, presumably because either Local 2 did not pursue the claim or because the arbitrator found it lacked merit.

he would grant the FSA grievance if Local 2 produced a letter from Mr. Kelly stating that his

intent in negotiating the FSA provision was that SMWIA would, as Local 2 claimed, assume the

administrative costs of the program. Local 2 agreed to provide such a letter, but never did. *See*

SMWIA Ex. 23 ("Kelly's letter still not received yet per Linda Bridges"). The grievance

therefore was arbitrated, and the arbitrator concluded that SMWIA had not violated the contract.

*See* SMWIA Ex. 25.[29]

In short, the FSA grievance simply was not a factor in either of the SMWIA's decisions

challenged in this case.

2.        Another Local 2 attempt to attack the bona fides of SMWIA's decisions was

premised on a misconception about how the grievance process works. Shop Steward Brian

Sullivan testified that his investigation of this grievance was the first one he had ever done. He

assumed – incorrectly – that he was entitled to interview managers. Therefore, he approached

two managers, who declined to talk with him. (One told Mr. Sullivan, appropriately, that he

would have to go through Mr. Nigro or SMWIA Counsel Patrick Riley.) Mr. Sullivan testified

that he felt the managers' unwillingness to talk to him somehow showed hostility toward the

union. That was not the case. Union representatives do not have any right to speak with

managers about pending grievances, and in our experience it is standard operating procedure for

employers to decline such access.

Consistent with that, Mr. Nigro sent a memo to managers (which somehow appeared

unsolicited in Mr. Sullivan's backpack) informing them that grievances had been filed and

advising them:

---

[29] The grievance about employees eating at their desks also was arbitrated, and the
decision largely favored the International Association. *See* SMWIA Ex. 6.

not to discuss any of the grievances with members of the bargaining unit, even if they approach you to discuss them with you. The grievances will be resolved according to the contractual grievance procedure. All related questions and concerns should be directed to me or to [Counsel] Patrick Riley.

OPEIU Ex. 12. This was another example of sound business practice, not anti-union animus.

      3.    Local 2 also argued that the SMWIA's hostility toward the union has been demonstrated by the decrease in the number of bargaining unit employees from 23 to the current 17.[30] What Local 2 ignores is the fact that *non-bargaining unit staff* also has been significantly reduced. Since 2004 alone, there were 11 organizers and one International Representative whom SMWIA did not replace, and the number of Assistants to the General President has effectively been reduced from two to one. SMWIA Ex. 29. These reductions are deeper percentage-wise than those in the bargaining unit (1/3 v. 1/4).

      Equally unavailing is Local 2's complaint about the April 2006 reduction of the number of secretaries from 5 to 4. As Mr. Nigro explained to the affected employee: "Due to a recent realignment of department heads and functions, it was determined that only 4 secretaries are needed to support the administrative and clerical duties of those departments. Therefore, the position of the 5th secretary has been reallocated to the membership department." OPEIU Ex. 9. The employee was not laid off, and there was no change in her pay or the scope of her job functions. She simply was transferred to another department. Thus, SMWIA was addressing its operational needs, without adverse consequences for the employee involved.[31]

---

[30] That decrease has occurred by attrition, not through terminations or layoffs. Three employees retired, and two went to work for another union, and one resigned. While the number of employees has gone down, the cost per employee has gone up. *See, e.g.,* SMWIA Ex. 27 and p. 5, above.

[31] This secretarial reallocation was consistent with the facts that non-bargaining staff have a higher level of computer skill than in the past, and that business increasingly is conducted by email rather than correspondence. *See* pp. 14-15, above.

4.     A related red herring raised by the Local 2 was the fact that SMWIA is considering subcontracting out some bargaining unit work.  It asserted, without support, that SMWIA was, in essence, being dismissive of Local 2, and not seriously addressing the issues. The record demonstrates otherwise.

In July 2006, Shop Steward Brian Sullivan asked if SMWIA was planning to outsource Local 2 work.  Mr. Nigro responded within a week, stating that SMWIA was not considering subcontracting at that time.  Mr. Nigro informed Local 2 that: "If in the future the SMWIA decides to limit our office operations or eliminate jobs resulting in layoffs, the SMWIA will follow the requirements of the collective bargaining agreement and applicable labor laws." OPEIU Ex. 18.

Six months later, SMWIA was assessing the possibility of subcontracting dues processing, and on January 18, 2007, General Secretary-Treasurer Nigro sent OPEIU a lengthy letter describing the operational and cost factors that were leading SMWIA to consider that option.  SMWIA Ex. 32.[32]  (The contract contains no restrictions on subcontracting.  *See* Jt. Ex. 1.)  Local 2 did not take SMWIA up on its offer to meet, but did respond angrily to the prospect of subcontracting.  *See* OPEIU Ex. 24.  More correspondence followed, *see* OPEIU Ex. 25, SMWIA Ex. 33, and a meeting eventually was scheduled to discuss the matter.  However, Mr. Nigro had to postpone it, but Local 2 did not contact his office to reschedule, as requested in the postponement letter.  *See* SMWIA Ex. 34.  In any event, no subcontracting has occurred, and SMWIA has dealt with Local 2 respectfully on this matter.[33]

---

[32] This exploration of subcontracting is fully consistent with Mr. Nigro's broad efforts to decrease costs and increase efficiency.  *See* pp. 11-12, above.

[33] The right of SMWIA to subcontract and the effects bargaining in which it will engage if the decision to subcontract is made, are not issues before the Arbitrator.  We note,

5.     Finally, in an attack designed to show that SMWIA's stated business reasons for

the changes were pretextual, Local 2 tried unsuccessfully to show that Mr. Nigro was not truthful

in explaining why those changes were needed.  Local 2 cited the fact that in a grievance meeting,

in discussing the International Association's financial situation, Mr. Nigro asserted that the

SMWIA's membership had declined.  At the hearing, Local 2 claimed, in essence, that Mr. Nigro

had lied about this.  The only "evidence" it proffered in support of this accusation were pages

from the Bureau of National Affairs Directory of U.S. Labor Organizations, 2005 and 2006

Editions, which state that the International Association's membership grew over those years

from 140,641 to 144,480.  OPEIU Ex. 15a and 15b.  Local 2 could not explain the source of

those numbers or the dates purportedly represented.

In any event, Mr. Nigro, using the International Association's own figures,

explained that membership had, in fact, declined from 2005 to 2006.  As SMWIA records

demonstrate, in 2005 total membership was 148,193.  A year later, it was 147,824.

SMWIA Ex. 30.  Significantly, there was a decrease not only in the total number of

members but also in the approximately 40% of the membership who work in the building

trades and who pay the highest rate of dues.  Indeed, the only membership group that

showed a significant increase (of 1,526) from 2005 to 2006 was the pre-apprentices, who

pay the lowest base dues rate – a flat $10 a month in 2007 as compared with $26 a month

for building trades members.  SMWIA Ex. 31.  (There similarly had been significant

losses in membership in other non-apprenticeship categories from 2004 to 2005.  Total

---

however, that if new technology, more web-based dues reporting for locals as described
by Mr. Nigro at the hearing, and possibly subcontracting can be more efficient and cost-
effective, SMWIA has the right to layoff or subcontract.  *See generally* Article XIII, Jt.
Ex. 1 at 17 (broad management rights clause).

membership increased largely because of an increase in pre-apprentices and apprentices.
By contrast, the number of building trades and other industry members declined. *Id.)*

## IV.   **CONCLUSION**

Local 2 correctly asserted at the hearing that the changes at issue were the product of
"new management." As one Local 2 witness complained, for example, Pat Emblem's
predecessor, Kathy Bishop, "didn't care about" the number of receipts that were being processed
in a month. Ms. Emblem, by contrast, has carefully monitored production and is seeking to bring
it up to an appropriate level. Similarly, former General Secretary-Treasurer Tom Kelly
apparently did not care that SMWIA was operating in the red. His successor has a different,
more prudent approach. Immediately upon assuming office, current General Secretary-Treasurer
Joe Nigro focused his attention on bring SMWIA's operations into the black, and on using
SMWIA's membership dues effectively and efficiently by cutting expenses, not filling
vacancies, and making staffing changes based on operational needs. We understand that Local 2
is unhappy about this new accountability. But that unhappiness does not somehow translate into
a contract violation.

SMWIA accepts, as it must, the contract that Mr. Kelly negotiated, however
irresponsibly. What is dispositive of this grievance, though, is that SMWIA has complied fully
with its obligations under that contract. Article V gave SMWIA the rights to return employees to
the regular work schedule, and to conclude that flexible shifts were no longer mutually
agreeable.

- 35 -

Therefore, the grievance should be denied.

Respectfully submitted,

Mady Gilson
mgilson@bredhoff.com
Bredhoff & Kaiser, PLLC
805 15th Street, N.W., Suite 1000
Washington, D.C. 20005
(202) 842-2600

Date:  August 8, 2007

Exhibit 4

Arbitration

Washington, DC

January 25, 2007

Page 1

```
1              FEDERAL MEDIATION AND CONCILIATION SERVICE

2                           ARBITRATION

3

4       Office and Professional

5       Employees International

6       Union, Local 2 and Sheet      FMCS No. 06-58502

7       Metal Workers International

8       Association

9

10

11                          Washington, D.C.

12                          Thursday, January 25, 2007

13            Arbitration hearing called in the above-entitled

14      matter, pursuant to agreement, taken at the offices of

15      Bredhoff & Kaiser, 805 15th Street, N.W., Washington, D.C.,

16      at 9:58 a.m., Thursday, January 25, 2007, and the

17      proceedings being taken down by Stenotype by DENNIS A.

18      DINKEL, FAPR, CRR, and transcribed under his direction.

19

20

21

22
```

ORIGINAL

Page 2

```
 1    BEFORE:

 2             JAMES E. CONWAY

 3             10906 Thimbleberry Lane

 4             Great Falls, VA 22066

 5             Phone  703-444-2725

 6

 7    APPEARANCES:

 8

 9         On behalf of Sheet Metal Workers International

10    Association:

11             MADY GILSON, ESQ.

12             Bredhoff & Kaiser

13             805 15th Street, N.W.

14             Washington, DC 20005

15             Phone:  202-842-2600

16                  and

17             RICHARD G. McCRACKEN, ESQ.

18             Davis, Cowell & Bowe

19             595 Market Street

20             San Francisco, CA 94105

21             Phone:  415-597-7200

22
```

Page 3

1    APPEARANCES  (Continued)

2

3            On behalf of Office and Professional Employees

4            International Union:

5            DAVID R. LEVINSON, ESQ.

6            1320 19th Street, N.W.

7            Suite 601

8            Washington, DC 20036

9            Phone:   202-223-3434

10

11

12

13

14

15

16

17

18

19

20

21

22

1        Q.      Okay.  And so in connection with those

2    goals, did you make a proposal to Local 2 for a

3    longer work week?

4        A.      Yeah.  Yeah.  Flexible schedule I guess

5    you would call it.  It's done at the national pension

6    fund; so we weren't reinventing the wheel.  The

7    pension fund of the international also has this

8    flexible schedule.  Part of the problem, as I saw it,

9    on both sides, what I tried to do was have a working

10   relationship with the union and the employees in

11   there.

12              As a union, the Sheet Metal Workers has

13   something we call best practices; and we encourage

14   our local unions to work with their employers so we

15   get more work.

16       Q.      Right.

17       A.      Okay.  And they become -- out to beat the

18   nonunion competition that we face.  I knew a lot of

19   these ladies that worked there -- both men and women

20   that worked there traveled great distances to get to

21   work, an hour and a half, two hours each way.

22              And what I saw was an opportunity here to

Page 40

1    expand the hours of operation in the office by

2    allowing people to come in earlier, if you will, and

3    eliminate that lunch that we were paying for; and at

4    the same time, servicing our locals because we had

5    just went through a major per capita tax increase;

6    and quite frankly, I thought that the international

7    should become a service organization for local unions

8    and let them know we cared about them and wanted to

9    work with them.

10           So that was all part and parcel of what

11   was in the negotiations.

12        Q.    Okay.  And do you recall any response from

13   Ms. Bridges about the economic value of paid breaks

14   or lunch, paid lunch?

15        A.    Yeah.

16           I think -- well, figuring it out, it was

17   about 130 hours on my calculations.  Lunch was 130

18   hours we were paying a year with no productivity.

19   Linda had a figure of about 3 percent -- I think she

20   pretty much was hanging on that.

21           We also had -- there's a break system in

22   there.  What I was trying to do was not have that

Page 41

1    type of thing in the agreement.  I didn't want --

2    let's see.  If somebody wanted to get up and get a

3    cup of coffee or whatever they may have on a break, I

4    didn't think it was productive to stop the operation,

5    to have this break.

6          So I agreed listen, if you have a cup of

7    coffee at your desk, a doughnut, whatever you have,

8    that's fine.  Just keep the work flow going and your

9    members -- meaning myself speaking to Ms. Bridges --

10   your members will get out of here earlier and they'll

11   all be happier.

12         What it was was part and parcel of what

13   we're supposed to be doing of, you know, working

14   together with the union to -- for more productivity.

15         And the switch -- we opened at 7:00.  The

16   switchboard stayed open until 6:00 o'clock at night.

17   Q.    Let me give you -- just so you have these

18   in front of you -- excerpts from the previous

19   contract showing the hours which I've got marked as

20   Union Exhibit 1.

21   A.    Okay.

22   Q.    And the current contract which is already

Page 44

1          A.     Oh, sure.

2          Q.     Do you recall characterizing the economic

3     and hours package as a single package?

4          A.     Yes.

5          Q.     Did Local 2 agree with that?

6          A.     Uh-huh.

7                 ARBITRATOR CONWAY:  Mr. Kelly, you have to

8     say yes or no for the benefit of the court reporter

9     here.

10                THE WITNESS:  Yes.

11                ARBITRATOR CONWAY:  So we get a clear

12    record.

13                BY MR. LEVINSON:

14         Q.     Now, you indicated that these compressed

15    work schedules were discussed during the negotiations

16    and that there was a precedent with these being used

17    at the Sheet Metal national pension fund?

18         A.     Yes.  It was talked at -- talked about at

19    negotiations and also with the two folks that

20    assisted me -- Kathy Bishop, the office manager, and

21    Jackie Bennett.  What I had proposed and was -- was

22    also in the pension fund contract, we weren't

Page 45

1    reinventing the wheel.  What I thought was we're

2    bringing these people in to work a longer day; and if

3    they could get a day off in this time period by

4    working the longer day, we're going to really

5    increase productivity here and we're going to have

6    some office employees, employees here that are happy

7    to come to work.

8              And that was like the tone of

9    negotiations.  And I think at first -- to be

10   perfectly honest with you, I don't know that

11   Ms. Bridges trusted me all that much.  But it worked

12   out to be pretty good.  And I had dealings with her

13   in the past and with the office employees in that

14   I -- during the health care -- some of the health

15   care situation, we had to increase deductibles, for

16   example, on our prescription plan.

17              Rather than just arbitrarily doing that,

18   and being a local union official myself at one time,

19   know the consequences that that brings, I had called

20   Ms. Bridges and said listen, this what is we have to

21   do, it will be the same -- we've have to increase

22   these contributions so I can get the rates down.

Washington, DC

January 25, 2007

Page 97

1    agreement.  Specific day, I can't tell you.  I would

2    say when we were close to an agreement.

3         Q.   Did you have any feeling for what the

4    percentage increase in the total cost of the office

5    employees contract would be for the first year?

6         A.   No.

7         Q.   Did that not matter to you?

8         A.   It mattered to me when he said that we

9    would have this, that this would be covered by two

10   employees covered.  That's what mattered to me.  I

11   knew -- what I took that as we weren't increasing our

12   costs.  We were upping our productivity.  And we were

13   meeting our needs.

14        Q.   You weren't increasing your costs?

15        A.   Not if we -- two employees were leaving.

16        Q.   Would that cover the cost of the whole

17   contract, the first year, or was Mr. Darcey specific

18   on that?

19        A.   What he said to me, two employees were

20   leaving.  Would cover the cost of the contract.

21        Q.   The whole contract?

22        A.   I presumed that meant the first year.  No.

Page 98

1    No.  Let me change that.  I have to change that.

2    What I got from that was that that was the cost of

3    the contract.

4        Q.    The entire contract?

5        A.    Yes, sir.

6        Q.    So do you have a feeling for what

7    percentage increase in payroll would be caused from

8    moving everyone from 35 hours to 40 hours per week?

9        A.    Well, I don't know that everyone did move.

10   But my answer is no.  I don't know what percentage of

11   payroll it cost.  What the increase was.

12       Q.    You don't know how many people moved to

13   the new schedule?

14       A.    That's what I said.  No, I don't know.

15       Q.    Assuming everybody did, do you have any

16   idea what the percentage increase in payroll costs

17   would be to the union -- just from that?

18       A.    I can't assume that everybody did.  My

19   answer several times has been no.  I don't know what

20   it cost.

21       Q.    Did you inquire at the time?

22       A.    I told you what I inquired about.  The

Washington, DC

January 25, 2007

1    that question.

2        Q.    Do you recall what the response was?

3        A.    I would assume it was yes, but I can only

4    make that assumption.

5        Q.    You don't have any recall?

6        A.    No.

7        Q.    Have you ever seen another collective

8    bargaining agreement that has alternate work

9    schedules?

10       A.    What I got was an idea that was in our

11   industry and was called rolling 410s, which meant

12   that you work Monday, Tuesday, Wednesday, and

13   Thursday, 40 hours.  Then another crew came in

14   Friday, Saturday, Sunday, Monday.  These rolling 410s

15   existed in our industry.

16       Q.    When you say our industry --

17       A.    Meaning the sheet metal industry.  More

18   specifically, when I was still at Local 19, we had a

19   lot of work in nuclear power plants.  And in order to

20   meet the needs of manning those jobs, we went on a

21   rolling 410s.  What that did was -- you know, it was

22   a question of how this is going to work, and our guys

Page 120

1    loved it.

2            And my idea here with this, whether it is

3    alternative, flexible, to get work done and have a

4    good relationship with the folks that worked there,

5    meaning having more productivity.

6            Specifically when I found out about the

7    National Pension Fund, I can't answer that question.

8        Q.    Let's go back to the rolling 410s you

9    described.  Under that regime, who decided how

10   workers should be scheduled under the agreement?

11           MR. LEVINSON:  Objection.  This is really

12   getting far afield.  I don't know see how this --

13           MR. McCRACKEN:  It ties into what

14   Mr. Kelly expected was going to be -- how this system

15   worked.

16           MR. LEVINSON:  I think he's answered these

17   questions about his intentions over and over.

18           ARBITRATOR CONWAY:  I'm going to overrule

19   the objection.

20           Do you have further extensive cross?

21           MR. McCRACKEN:  No.  I'm probably 15

22   minutes from the conclusion.

# Exhibit 5



# SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION

1750 New York Avenue, N.W.
Washington, D.C. 20006-5386
Phone: (202) 662-0845
FAX: (202) 662-0893

June 20, 2006

JOSEPH J. NIGRO
General Secretary-Treasurer

Brian Sullivan, Assistant Shop Steward
1750 New York Avenue, NW
Washington, DC  20006

<u>Hand-Delivered on June 20, 2006</u>

Linda Bridges, 1st Vice President
OPEIU, Local 2
8455 Colesville Rd.
Silver Spring, MD  20910

<u>Certified Mail No.7003 0500 0005 0046 8202</u>

**RE:     Hours of Work**

Dear Brian and Linda:

This letter is to officially give you notice that due to departmental and business needs, any and all alternative work schedules will cease at the end of the work day on Friday, July 28, 2006.  All collective bargaining unit members will return to a regular 5/35-work schedule effective Monday, July 31, 2006.  Our notice fulfills the 10-day prior notice to employees as stipulated under Article V, Hours of Work-Overtime, paragraph, titled, Establishment or Change of Hours.

This change will commence with the beginning of a work week; pay cycle; and will give employees over 20 working days to make necessary transportation and personal arrangements to return to the regular work schedule.  Also be advised that the agreement defines the regular work week as follows: *The regular work week shall consist of five (5) seven (7) hour days, Monday through Friday, 35 hours per week exclusive of a thirty (30) minute, forty-five (45), or (60) minute unpaid lunch period.  The normal work hours shall be:  Start time 9:00 a.m. and quitting time 4:30 p.m.*"

Because this change in hours of work will impact the current vacation and sick time accruals, these will be adjusted to reflect the appropriate hours earned based on the regular work week effective with the corresponding pay cycle.

We will communicate this change to all affected members effective with the date of this letter.  If you wish to further this discuss this matter, please call me.

Sincerely,

*Joseph J Nigro*

Joseph J. Nigro
General Secretary-Treasurer

cc:  Michael J. Sullivan, General President
     Department Directors

JJN/pae

# Exhibit 6



# OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION
## LOCAL 2, AFL-CIO

8455 Colesville Road, Suite 1250
Silver Spring, Maryland 20910-3320

## Grievance Report Form

**GRIEVANT**  OPEIU LOCAL #2 _____  **DATE** July 6, 2006 _____

**EMPLOYER**  Sheet Metal Workers International Association _____

**DEPARTMENT**  All _____  **CLASSIFICATION** _____

**ARTICLE(S) VIOLATED**  Article II Recognition; Article V Hours of Work-Overtime;
Article VII – Wages; Article XIII – Functions of Management; past practice,
standards of fairness and reasonableness, entire Agreement, mid-term bargaining,
and all legal recourse including NLRB.

**GRIEVANCE**  Employer violated the Agreement by changing employee working hours
without a reasonable business necessity or a significant change in underlying
circumstances; equitable estoppels; and jeopardized the solvency of the pension plan;
and bargained in bad faith.

_(Grievant's Signature)_
_Shop Steward_

**FIRST STEP DECISION** _____
No agreement reached, move to step 2

_07/12/06_
**(Employer Representative)**              **(Union Representative)**
                                           7/12/06

**SECOND STEP DECISION** "However, the Employer will determine the
schedule based on departmental needs."

**(Employer Representative)**              **(Union Representative)**

**THIRD STEP DECISION** _____

**(Employer Representative)**              **(Union Representative)**

**ARBITRATOR'S AWARD** _____

**NOTE: Union signature at each step is only indicative that such step is taken and does not reflect concurrence in the
decision rendered unless so specified in his/her stated position.**

# Exhibit 7

# SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION

1750 NEW YORK AVE., NW,
WASHINGTON, DC 20006



PHONE: (202) 662-0845
FAX: (202) 662-0893
EMAIL: jnigro@smwia.org

**JOSEPH J. NIGRO**
GENERAL SECRETARY-TREASURER

July 31, 2006

Linda Bridges
Staff Representative
8455 Colesville Road, Suite 1250
Silver Spring, MD 20910-3320

Dear Ms. Bridges:

This letter is in response to OPEIU Local 2's request for information received by mail on July 10. The request is related to three grievances file by Local 2 against the SMWIA on July 6. The rule obliging an employer to provide information is not *per se* but must be determined on a case-by-case basis. The issues are whether the requested information is relevant and sufficiently important, and whether it exists, is available and is not confidential or privileged. Accordingly, the responses seriatim are:

1. A copy of the relevant portions of SMWIA's 2005 bargaining notes is enclosed.

2. & 3. When the employer expresses an inability to pay, disclosure of financial information is triggered, but not when the employer is merely unwilling to pay. *Lakeland Bus Lines, Inc .v. NLRB,* 347 F.3d 955 (D.C. Cir. 2003). The SMWIA has not expressed an inability to pay, and therefore, is not required to disclose its most recent or the previous year's financial reports.

4. The minutes of the SMWIA Executive Council are confidential.

5. Notes or emails from Pat Emblem regarding working hours do not exist.

6. Other than correspondence from the former Director of Membership Records, correspondence or notes from Department Directors regarding working hours do not exist. A copy of the correspondence is enclosed.

7. The number of calls received in each department, by individual and time received are essentially unavailable. The phone system can only provide a lump sum of calls to the SMWIA number per hour for the previous and current days.



OPEIU
LOCAL 2
EXH. NO. 17

SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION

Page Two (2)
July 31, 2006

8. A copy of the complaints regarding the failure to complete assigned tasks is enclosed.

9. There is no document in existence showing a break down of the method used to calculate the work performed.

10. The request for a copy of the information used by the SMWIA to justify the change is vague.

11. A copy of the last year of production for Ms. Emblem's department is enclosed.

12. A copy of the last actuarial report for the Office Employees Pension Fund is enclosed.

Sincerely,

Joseph J. Nigro
General Secretary-Treasurer

JJN/PJR/dmh
cc:     Patrick Riley
        Pat Emblem