UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                )
OFFICE & PROFESSIONAL EMPLOYEES    )
INTERNATIONAL UNION, LOCAL 2,           )
                                                )
                    Plaintiff,                  )
                                                )
v.                                              )        No. 1:07-cv-02124-RWR
                                                )
SHEET METAL WORKERS                       )
INTERNATIONAL ASSOCIATION,             )
                                                )
                    Defendant.               )
_____)

**DEFENDANT'S RESPONSE TO
PLAINTIFF'S MOTION FOR VOLUNTARY DISMISSAL**

Plaintiff Office and Professional Employees International Union, Local 2 ("Local 2")

filed this lawsuit in an attempt to vacate a labor arbitration award entered in favor of defendant

Sheet Metal Workers International Association ("SMWIA").  The parties had agreed, and the

Court had ordered, that cross-motions for summary judgment be filed no later than May 2, 2008.

On that date, Local 2 moved instead to dismiss the action pursuant to Fed. R. Civ. P. 41(a)(2).

SMWIA does not oppose dismissal of the action, but it does ask the Court to condition

that dismissal on the payment by Local 2 of the costs and attorney's fees incurred by SMWIA in

its defense of the action – including its preparation of a summary judgment motion that it was

about to file when Local 2 moved to dismiss.

**BACKGROUND**

This case arose out of a labor arbitration award issued on August 26, 2007, by Arbitrator

James E. Conway in favor of SMWIA – an international union that employs, at its headquarters

in Washington, D.C., some 23 support personnel who are represented in collective bargaining by

Local 2.  The dispute at issue involved a grievance filed by Local 2 alleging that SMWIA had

violated the terms of the parties' collective bargaining agreement by discontinuing alternative

work schedules and requiring employees to return to regular work schedules.  In his arbitration

award, Arbitrator Conway concluded that SMWIA had acted within its authority under the

collective bargaining agreement, which gave SMWIA the authority to change the alternative

shift schedules on the basis of "departmental needs."

On November 26, 2007, Local 2 initiated this action to vacate Arbitrator Conway's

award.  Pursuant to agreement of the parties, the Court entered a scheduling order under which

cross-motions for summary judgment would be due on May 2, 2008, with briefs in response due

on May 23.  Dkt. #7.  SMWIA had completed and was preparing to file its summary judgment

brief on the morning of May 2 when it was informed by Local 2's counsel that Local 2 wished to

dismiss the action voluntarily under Rule 41(a).  After discussions of counsel failed to achieve

agreement on a stipulated dismissal, Local 2 filed the instant motion under Rule 41(a)(2).

## ARGUMENT

Rule 41(a)(2) authorizes the Court to dismiss an action at the plaintiff's request "on terms

that the court considers proper."  Fed. R. Civ. P. 41(a)(2).  As the D.C. Circuit has explained in

its leading case on this issue:

> The purpose of the "terms and conditions" clause is to protect a defendant from
> any prejudice or inconvenience that may result from a plaintiff's voluntary
> dismissal.  Attorneys' fees and costs are commonly awarded as one such "term
> and condition" for a voluntary dismissal, for those costs were undertaken
> unnecessarily in such a case.

*GAF Corp. v. Transamerica Ins. Co.*, 665 F.2d 364, 367 (D.C. Cir. 1981).[1]

---

[1] The Circuit's cases create an exception to this rule where the plaintiff seeks voluntary
dismissal in order to pursue the same litigation in another forum, to the extent that the expenses
incurred by the defendant will be useful in that continuing litigation.  *McLaughlin v. Cheshire*,

In this case, conditioning the dismissal Local 2 requests on its payment of SMWIA's costs and attorney's fees would be particularly appropriate for at least two reasons.

First, Local 2 waited to move to dismiss until the very day that cross-motions for summary judgment were due, thus ensuring that SMWIA would be put to the expense of preparing a summary judgment motion. And it is particularly relevant in that regard that there has been neither discovery nor previous motions practice in this matter – nothing that would have changed a litigant's assessment of the merits of its case. To the contrary, Local 2 knew or should have known as much about its chances of success when it began this litigation in November 2007 as it did when it moved to dismiss on May 2, 2008. That it waited to seek dismissal until the moment when SMWIA's summary judgment motion was due has severely prejudiced SMWIA, and without justification, by imposing on SMWIA wholly unnecessary litigation expenditures.

Second, Local 2's attempt through this action to vacate Arbitrator Conway's award is so utterly frivolous that it is entirely likely, had the matter been litigated to completion, that SMWIA would have been entitled to an award of attorney's fees because of Local 2's pursuit of this litigation in bad faith. *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975).

As SMWIA explained in the summary judgment brief that it was about to file when Local 2 moved to dismiss, the standard for judicial review of labor arbitration awards is extremely narrow. *See*, *e.g.*, *Hotel Ass'n of Washington v. Hotel & Rest. Employees, Local 25,* 963 F.2d 388, 389 (D.C. Cir. 1992); *APWU v. USPS,* 52 F.3d 359, 361 (D.C. Cir. 1995). An arbitration

---

676 F.2d 855, 856-57 (D.C. Cir. 1982); *cf. Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 771 F.2d 521, 528 (D.C. Cir. 1985). Here, Local 2 has given no indication that it intends to pursue this litigation elsewhere; nor is it apparent that could do so.

award may be vacated only if the arbitrator exceeds his authority or if the award fails to draw its essence from the collective bargaining agreement, *United Paperworkers Int'l Union, v. Misco, Inc.* 484 U.S. 29, 36 (1987), and in this case there is not even a remotely colorable argument that Arbitrator Conway's award failed that test – as we explained in the summary judgment memorandum that we were prepared to file on May 2, which we attach hereto as Exhibit 1.  (We also attach Arbitrator Conway's award as Exhibit 2.)

A litigant's bad faith in bringing a lawsuit can be inferred from "bringing a frivolous suit – frivolousness connoting not just a lack of merit but so great a lack as to suggest that the suit must have been brought to harass rather than to win."  *Coyne-Delany Co. v. Capital Dev. Bd.*, 717 F.2d 385, 390 (7th Cir. 1983).  The apparent lack of any merit whatever to Local 2's attempt through this litigation to vacate Arbitrator Conway's award – and the strong possibility that SMWIA would, accordingly, have been entitled to attorney's fees upon completion of the litigation – thus provides further support for conditioning dismissal of this action on Local 2's payment of the costs and attorney's fees that SMWIA has been forced to bear in this matter.

## CONCLUSION

The Court should condition its approval of Local 2's motion to dismiss this action upon its payment of the litigation costs and attorney's fees incurred by SMWIA.

Respectfully submitted,

/s/ John M. West
John M. West
D.C. Bar #424718
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth St., N.W.
Suite 1000
Washington, D.C. 20005
(202) 842-2600

Counsel for Defendant

# Exhibit 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
OFFICE & PROFESSIONAL EMPLOYEES         )
INTERNATIONAL UNION, LOCAL 2,           )
                                        )
                Plaintiff,              )
                                        )
v.                                      )        No. 1:07-cv-02124-RWR
                                        )
SHEET METAL WORKERS                     )
INTERNATIONAL ASSOCIATION,              )
                                        )
                Defendant.              )
_____)

## DEFENDANT'S MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

This case arises out of an arbitration award issued by Arbitrator James E. Conway

in favor of defendant Sheet Metal Workers International Association ("SMWIA").  The

dispute at issue involved a grievance filed by plaintiff Office and Professional Employees

International Union, Local 2 ("Local 2") – the union that represents certain staff members

employed by SMWIA – alleging that SMWIA had violated the terms of the parties'

collective bargaining agreement by discontinuing alternate work schedules and returning

employees to regular work schedules. In the arbitration award under review here,

Arbitrator Conway concluded that the SMWIA had acted within its authority under the

collective bargaining agreement, which gave SMWIA the authority to change the

alternative shift schedules because of "departmental needs."

Under the highly deferential standard upon which labor arbitration awards are

reviewed, Local 2's request that Arbitrator Conway's award be vacated must be denied.

The arbitrator's decision drew its essence directly from the collective bargaining agreement and was well within the arbitrator's authority.

## BACKGROUND

**A**.  Defendant SMWIA is an international union representing 150,000 workers, most of them employed in HVAC construction and production of metal products. SMWIA employs a staff of about 70, many of whom have field assignments.  Those who work in SMWIA's Washington, D.C. headquarters include 23 support staff members who make up a collective bargaining unit that is represented by Local 2. Exh. 2 (arbitration award) at 4.[1]

The SMWIA and Local 2 have had a series of collective bargaining agreements dating back to at least 1993.  *Id.* The current agreement, effective from October 1, 2005 through September 30, 2009, contains in its Article V the provisions for alternative work schedules that are at issue here.  Article V provides for either a standard 35-hour, 5-day work week, or various alternative work schedules ranging up to 40 hours a week, with a compressed work week. Exh. 1 (agreement) at 7.  In a section of the agreement captioned, "Establishment or Change of Hours," the parties negotiated a procedure by which these schedules were to be established:

> The Employee has the option of working a Regular Work Week or an Alternative Shift as described above.  Employees will indicate their preference for work hours.  The Employer will then consider those preferences and seniority when establishing alternative scheduled work hours.  However, the Employer will determine the schedule based on departmental needs.  Such approval will not be unreasonably withheld and will be based on business necessity.

---

[1] The parties have stipulated that the record upon which the case should be decided consists of 1) all exhibits submitted to the arbitrator; 2) the transcript of the first day of the arbitration hearing (the second and third hearing days were not transcribed); 3) post-hearing briefs filed by the parties; and 4) the arbitrator's award. *See* Dkt. # 6.  Portions of this record upon which the parties rely are contained in a Joint Appendix, filed by defendant on this date, and are cited herein as "Exh. __."

*Id.* at 8-9.

The contract also includes a "safety-valve" clause that gives SMWIA the right to return employees to a regular schedule if business needs warrant:

> If a departmental need arises that would require a change in the alternative scheduled work week, back to the regular work schedule, the Employer shall provide ten (10) working days notice to the employee.

*Id.* at 9.

**B**. In February 2006, SMWIA General Secretary-Treasurer Joseph Nigro initiated an overall internal evaluation of SMWIA's operations because of declining dues receipts and other financial pressures.  Exh. 2 (arbitration award) at 5. As a result of this assessment, the SMWIA determined that the alternative work schedules had not increased productivity – despite the fact that employees were working longer hours – and had created staffing shortages due to a large number of employee absences on Fridays and Mondays.  *Id.* at 16.  Consequently, on June 20, 2006, the SMWIA announced its intention to eliminate the alternative work schedules and return all employees to the pre-existing regular work week, effective July 31, 2006.  Exh. 5 (June 20, 2006 letter).  In making this announcement, the SMWIA explained that the elimination of the alternative schedules was due to "departmental and business needs."  *Id.*

On July 6, 2006, Local 2 filed a grievance challenging SMWIA's action, and following the denial of the claim at the third step of the grievance process, the grievance was submitted to arbitration. Exh. 6 (July 6, 2006 grievance).  Arbitration hearings were held on January 25, June 4, and June 5, 2007.  As stated by the arbitrator in his award, the issue was as follows:

> Did the SMWIA violate the Agreement by discontinuing the alternative
> work schedule arrangements agreed to in November, 2005 and requiring
> employees to revert back to regular work schedules in June, 2006? If so,
> what is the appropriate remedy?

Exh. 2 (arbitration award) at 2.

During the course of the arbitration, and in its post-hearing brief, the SMWIA

presented evidence that it had negotiated the current contract with the goal of increasing

productivity and extending service to its local unions. Exh. 4 (transcript) at 39-40, 41,

45, 97, 120; Exh. 3 (post-hearing brief of SMWIA) at 6-7. The SMWIA also presented

evidence that the decision to eliminate the alternative schedules was based on its eventual

conclusion that, contrary to its expectations, the alternative schedules had led to

decreased productivity and had not achieved the goal of extended service to the locals.

Exh. 3 (post-hearing brief of SMWIA) at 14-18 (citing testimony and exhibits). The

SMWIA argued that its general financial distress had necessitated across-the-board

budget cuts, and that the return of SMWIA employees to a regular work schedule was

necessary to improve its operational efficiency. *Id.* at 11-12.

Local 2 argued that even if the SMWIA did have the authority to return

employees to standard schedules under the current contract, the SMWIA had not shown

adequate reason for revoking the alternative schedules. Local 2 argued that the standard

of "departmental needs" required SMWIA to prove particularized harm within a specific

department, rather than generalized financial harm. Local 2 also challenged the

SMWIA's assertions that the alternative schedules were inefficient. Exh. 2 (arbitration

award) at 7-8, 9.

In his award issued on August 26, 2007, Arbitrator Conway concluded that the

SMWIA had acted within its authority under the agreement in returning employees to the

standard schedule.  The arbitrator determined that the SMWIA had the authority to

rescind or alter the alternative schedules based on "departmental needs," and that this

language "cannot fairly be read to require the employer to establish that but for the

changes the department would fail."  Exh. 2 (arbitration award) at 17.  The arbitrator

concluded that in order to succeed in its grievance, Local 2 "must offer persuasive

evidence that SMWIA had no reasonable basis for, no 'need,' to modify work hours," *id.,*

and he determined that Local 2 had failed to meet this burden:

> [G]iven that the SMWIA was, as alleged, operating in a generalized state
> of financial distress, and recognizing that the employer's individual
> departments are subordinate units of the larger organization and their
> interests subsumed within the more comprehensive whole, the employer's
> actions here must be found to have reasonably met the test of
> "departmental needs."

*Id.*  The arbitrator held, accordingly, that the SMWIA had not violated the agreement by

requiring employees to return to standard schedules, and he therefore denied the

grievance filed by Local 2.

On November 26, 2007, Local 2 filed the instant petition to vacate the award.

## ARGUMENT

The Court's authority to review the merits of a labor arbitrator's award is

extremely limited.  Courts must defer to and enforce a labor arbitration award if it "draws

its essence" from the applicable labor agreement. *United Paperworkers Int'l Union, v.*

*Misco, Inc.* 484 U.S. 29, 36 (1987).  Under that narrow standard of review, this award

must be upheld.  Far from exceeding his authority, Arbitrator Conway did precisely what

the parties to the collective bargaining agreement envisioned that an arbitrator would do:

he carefully examined the contractual language and bargaining history and made a

reasoned determination as to which party's interpretation was correct.  That Local 2 disagrees with his decision is, under applicable law, no reason to vacate the award.

### A.  Judicial Review of Labor Arbitration Awards is Extremely Deferential

Judicial review of labor arbitration awards is "confined within exceedingly narrow bounds."  *Hotel Ass'n of Washington, D.C. v. Hotel & Rest. Employees, Local 25,* 963 F.2d 388, 389 (D.C. Cir. 1992); *APWU v. USPS,* 52 F.3d 359, 361 (D.C. Cir. 1995).  That is because private dispute resolution through grievances and arbitration under labor agreements "is at the very heart of the system of industrial self-government." *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 581 (1960).  "Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties."  *Id.*  As the Supreme Court has emphasized, the "refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.  The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Steelworkers v. Enterprise Wheel & Car Corp.* 363 U.S. 593, 596 (1960).

Indeed, the Court has explained that what the parties to a collective bargaining agreement have bargained for is to have their disputes over the meaning of the agreement decided by an arbitrator rather than by the courts:  "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator" and "[the arbitrator's] judgment and all that it connotes . . . was bargained for" by the parties. *Steelworkers v. American Mfg. Co.* 363 U.S. 564, 567-68 (1960).

Accordingly, the circumstances under which a court may vacate an arbitration award are exceedingly narrow.  "Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator," and may not be re-examined on review by a court.  *Id.* at 568.  Neither a disagreement with the arbitrator's findings of fact nor a difference of opinion about the correct interpretation of the contract is an occasion for judicial intervention. "[A] federal court may not overrule an arbitrator's decision simply because the court believes its own interpretation of the contract would be the better one." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers of Am.,* 461 U.S. 757, 764 (1983).  To the contrary, as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he erred does not suffice to overturn his decision. *Misco,* 484 U.S. at 38; *Hotel Ass'n of Washington, D.C.*, 963 F.2d at 389.

Indeed, the "scope of an arbitrator's authority is itself a question of contract interpretation that the parties have delegated to the arbitrator."  *W.R . Grace & Co.,* 461 U.S. at 765; *see also Madison Hotel v. Hotel & Rest. Employees, Local 25,* 144 F.3d 855, 858-59 (D.C. Cir. 1998).  Thus, the arbitrator's conclusions as to the scope of his authority is afforded "the same judicial deference as an arbitrator's interpretation of a collective bargaining agreement" generally.  *Madison Hotel,* 144 F.3d at 857.

This is not to say that a court may never overturn an arbitration award.  A court may vacate an arbitration award if the award "fails to draw its essence from the collective bargaining agreement" – for instance, by "render[ing] a judgment based on external legal sources, wholly without regard to the terms of the parties' contract." *Id.* at 858-59 (citing *APWU v. USPS,* 789 F.2d 1, 8 (D.C. Cir. 1986)).  But "[i]t is only when the arbitrator

*must* have based his award on some body of thought, or feeling, or policy, or law that is outside the contract … that the award can be said not to draw its essence from the collective bargaining agreement."  *Ethyl Corp. v. United Steelworkers of Am.,* 768 F.2d 180, 184-85 (7th Cir. 1985) (emphasis in original; internal quotation marks and citation omitted).

A court may not determine that an arbitrator exceeded his authority based on the fact that the arbitrator gave more weight to certain contractual provisions than others, or because the arbitrator interpreted the contract in a way that differs from that of the court. *Madison Hotel* 144 F.3d at 859.  A court must enforce the award "so long as the arbitrator purports to be interpreting the contract rather than dispensing 'his own brand of industrial justice.'" *Utility Workers Union of Am., Local 246 v. NLRB,* 39 F.3d 1210, 1216 (D.C. Cir. 1994) (citing *Enterprise Wheel,* 363 U.S. at 597.)

In sum, review of labor arbitration awards calls for "the greatest deference imaginable." *Id.*  Courts "are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." *Misco,* 484 U.S at 36.

As we now show, the present case does not present one of the "rare instances," *Eastern Associated Coal Corp. v. United Mine Workers,* 531 U.S. 57, 62 (2000), in which a court may set aside an arbitration award.  To the contrary, the arbitrator's decision in this instance was entirely based on his interpretation of the relevant contractual language, and was well within his authority.

**B. Under the Applicable Deferential Standard, the Court has No Warrant to Vacate the Arbitrator's Ruling**

Under the highly deferential standard of review discussed above, there is simply no basis for this Court to vacate Arbitrator Conway's award, which was based squarely on the language and history of the collective bargaining agreement. As Arbitrator Conway himself put it – in rejecting Local 2's contentions based on equity and alleged ulterior motives – "[t]he Agreement has the last word." Exh. 2 (arbitration award) at 12.

Taking the language of the collective bargaining agreement as his point of departure, the arbitrator first reviewed Article V's descriptions of the various regular and alternative work week options, *id.* at 12-13, and then got to the heart of the matter. The portion of Article V dealing with "Establishment or Change of Hours" provided that "…the employee has the option of working a Regular Work Week or an Alternative Shift as described above," *id.* at 13 (quoting Art. V), but this option was constrained by what followed:

> Employee preferences and seniority will receive consideration when alternative work hours are established, but neither bids nor seniority are dispositive:
>
> > "However, the employer will determine the schedule based on departmental needs. Such approval will not be unreasonably withheld and will be based upon business necessity." …

*Id.* (quoting Article V) (emphasis deleted). This contractual language led the arbitrator to the conclusion that "the contractual intent was to give employees the option of working *such alternative shifts as the employer determines to make available based on departmental needs*." *Id.* (emphasis added).

Arbitrator Conway then turned to the final sentence in the "Establishment or Change of Hours" section of Article V, which, he explained, "simply obligates the

employer to provide 10 days advance notice of change to employees" – a requirement

SMWIA had far exceeded with nearly five weeks advance notice – and that the only

other limitation this sentence imposed was that "changes must be based on departmental

needs." *Id.* at 14.

The arbitrator accordingly devoted the next several pages of his award to parsing

the meaning of the term "departmental needs." He first responded to an "intricate"

argument put forth by Local 2, based on the interplay between the "departmental needs"

language regarding alternative shifts and the "feasibility" language governing a provision

for "flexible shifts" that was carried over from the previous collective bargaining

agreement, *id.* at 14-15 – ultimately concluding that "the tests of 'feasibility' applicable

to flexible shifts and 'departmental needs' applicable to alternative shifts are for all

practical purposes synonymous. . . . As to both flexible and alternative schedules,

employer assent is required." *Id.* at 15. And he found that conclusion buttressed by other

examples of "repetition and superfluous language" in the collective bargaining

agreement. *Id.*

Finally, the arbitrator considered and rejected Local 2's contention that SMWIA

had shown no evidence of "departmental needs" except with respect to the membership

department, and insufficient evidence even there. *Id.* at 15-17. The arbitrator credited

SMWIA's evidence that it was "operating in a generalized state of financial distress," *id.*

at 17, due to declining membership, that the alternative work schedules had not resulted

in any increase in productivity (and in the largest department, there was evidence of the

opposite), *id.* at 16-17, that the "departmental needs" language "cannot fairly be read to

require the employer to establish that but for the changes the department would fail," *id.*

at 17, and that under these circumstances the term "departmental needs" could not reasonably be read to prohibit SMWIA's changes in work schedules where "the employer's individual departments are subordinate units of the larger organization and their interests subsumed within the more comprehensive whole." *Id.*

In short, the reasoning of the award makes apparent that the arbitrator did not disregard the terms of the contract, nor did he base his decision on some external authority. Indeed, apart from his citation of several canons of construction, the arbitrator relied on no authority other than the collective bargaining agreement itself and the evidence that the parties had presented to him.

Under the applicable narrow standard of judicial review of labor arbitration awards, disagreement over how an arbitrator interpreted the contractual language and applied it to the evidence before him is an insufficient basis for vacating an arbitration award. Local 2 may not like the result reached by Arbitrator Conway, but the teaching of the cases discussed above is that the arbitrator's judgment as to the meaning of the contractual language and the application of that language to the facts is what the parties bargained for. Where, as here, the arbitration award draws its essence from the collective bargaining agreement, it is not for the Court to second-guess the arbitrator's construction of that agreement.

Arbitrator Conway acted well within his discretion in giving meaning to the terms of the contract. Accordingly, this Court is required to defer to the judgment of the arbitrator, and to uphold the arbitration award.

**CONCLUSION**

For the foregoing reasons, this Court should grant summary judgment for the

SMWIA and deny Local 2's request to vacate the arbitration award.

Respectfully submitted,


/s/ John M. West_____
John M. West
D.C. Bar #424718
BREDHOFF & KAISER P.L.L.C.
805 Fifteenth St., N.W.
Suite 1000
Washington, D.C. 20005
(202) 842-2600
Counsel for Defendant Sheet Metal
Workers International Association

# Exhibit 2

## FEDERAL MEDIATION AND CONCILIATION SERVICE

| | |
|---|---|
| Arbitration in the Matter of | ) |
| | ) |
| SHEET METAL WORKERS | ) |
| INTERNATIONAL ASSOCIATION | ) |
| | ) |
| -and- | ) |
| | ) |
| OFFICE & PROFESSIONAL | ) |
| EMPLOYEES INTERNATIONAL | ) |
| UNION, Local 2 | ) |

**OPINION AND AWARD**

FMCS Case No. 06-058502

Alternative Schedule Work Week

### APPEARANCES:

For SMWIA:

Mady Gilson, Esq.
Bredhoff & Kaiser, P.L.L.C.
Washington, DC

Richard G. McCracken, Esq.
Davis, Cowell & Bowe
San Francisco, CA

For OPEIU:

David R. Levinson, Esq.
Attorney At Law
Washington, DC

### INTRODUCTION:

The Sheet Metal Workers International Association ("SMWIA" or "Employers") and the Office & Professional Employees International Union, Local 2 ("OPEIU" or "Employees") are parties to a collective bargaining agreement ("Agreement") concluded on November 10, 2005. Pursuant to Article XV thereof, disputes not settled in grievance handling are subject to binding arbitration.

Although the Agreement incorporates terms permitting employees to select any of four alternative work schedules, on June 20, 2006 the SMWIA announced its intentions to eliminate such schedules and require all employees to revert to the pre-existing regular work weeks.

On July 6, 2006 the OPEIU challenged that action, later filing an unfair labor practice

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

charge with the National Labor Relations Board ("NLRB") alleging bad faith bargaining in violation of Section 8(a)(5) of the Act. [1] Following denial of the claim at the third step hearing of the grievance process the OPEIU invoked its right to submit the dispute to arbitration. This Arbitrator was then selected from a panel supplied by the Federal Mediation and Conciliation Service ("FMCS") to hear the case and render a decision.

Hearings were conducted on January 25, June 4 and June 5, 2007 at the law offices of Bredhoff & Kaiser, Washington, DC in accordance with the rules of the FMCS. Neither party raised procedural issues. The first day of hearings was transcribed. All documentary materials received in evidence; the transcript from January 25; the Arbitrator's notes from the second two hearing days; and the parties' post hearing briefs exchanged on August 8, 2007 constitute the record in the matter.

STATEMENT OF ISSUE:

Did the SMWIA violate the Agreement by discontinuing the alternative work schedule arrangements agreed to in November, 2005 and requiring employees to revert back to regular work schedules in June, 2006? If so, what is the appropriate remedy? [2]

RELEVANT CONTRACT TERMS:

ARTICLE V – *Hours of Work – Overtime*

"A. Hours of Work – All new hires shall be retained at a five (5) day, forty (40) hour (5/40) work week or a nine (9) day eighty hour (9/80) schedule; with the option to choose a different work week schedule after the completion of one (1) year.

Regular Work Week 5/35

The regular work week shall consist of five (5) seven (7) hour days, Monday through Friday, 35 hours per week exclusive of a thirty (30) minute, forty-five (45), or sixty (60) minute unpaid lunch period. The normal work hours shall be: start time 9:00 a.m. and quitting time 4:30 p.m.

However, employees are able to elect an Alternative Schedule of 5/40, 9/74, or 9/80 shift as follows:

5/40 Work Week

(*Descriptive language omitted.*) Each employee will have an option of

---

[1] The record reflects that the NLRB has deferred processing the charge pending the conclusion of arbitration.
[2] We reject the OPEIU's formulation of the issue to include the 8(a)(5) bad faith bargaining allegations. Those issues are beyond the jurisdiction of the Arbitrator.

2

choosing the five/forty (5/40) work week.

## 9/74 Work Week

(*Descriptive language omitted.*) Each existing employee will have the option of selecting a Bi-weekly schedule consisting of one (1) five (5) day Monday through Friday work week and one four (4) day work week.

During the four (4) day portion of the bi-weekly schedule, either a Monday, Wednesday or Friday will be designated by the employee as the primary regularly scheduled day off. Employees are free to select Tuesday or Thursday if desired, subject to management's approval.

The employer shall make all reasonable efforts to schedule the requested day off. In instances where more employees want the same day off other than those available, such days shall be scheduled based on the seniority of the employees.

## 9/80 Work Week

(*Descriptive language omitted.*) Each existing employee will have the option of selecting a Bi-weekly schedule consisting of one (1) five day Monday through Friday work week and one (1) four (4) day work week.

During the four (4) day portion of the bi-weekly schedule, either a Monday, Wednesday or Friday will be designated by the employee as the primary regularly scheduled day off. Employees are free to select Tuesday or Thursday if desired, subject to management's approval.

The employer shall make all reasonable efforts to schedule the requested day off. In instances where more employees want the same day off other than those available, such days shall be scheduled based on the seniority of the employees.

## Establishment Or Change of Hours

The Employee has the option of working a Regular Work Week or an Alternative Shift as described above. Employees will indicate their preferences for work hours. The Employer will then consider those preferences and seniority when establishing alternative scheduled work hours. However, the Employer will determine the schedule based on departmental needs. Such approval will not be unreasonably withheld and will be based on business necessity.

If a departmental need arises that would require a change in the alternative scheduled work week, back to the regular work schedule, the Employer shall provide ten (10) working days notice to the employee.

## Flexible Shifts

Flexible shifts may be offered to employees in departments where flextime

3

is feasible and mutually agreeable. Employees shall have the option of taking individual breaks to be deducted from their lunch period.

Additionally, the employee may pre-schedule an occasional change in their 9/74 or 9/80 day off in lieu of taking leave. Such change is subject to supervisory approval.

<u>Starting Times</u>

Employees shall have the option of a quarter hour start time, beginning at 6:00 AM and through 10:00 AM."

### ARTICLE XIII – *Functions of Management*

"A. The SMWIA shall remain vested with full and exclusive control of the supervision of all operations and the direction of all working forces, including the right to hire, promote, demote, discipline, suspend and discharge employees; to determine the number of its employees; to transfer employees; or to extend or limit any of its operations; or to eliminate any jobs; to determine the work to be performed by each employee; and to make or modify such reasonable rules and policies for the purpose of maintaining order, safety and/or effective operations; except those granted or modified by this Agreement and to require compliance therewith by the employees."

## BACKGROUND FACTS

The record reflects that the employer union, headquartered in Washington, DC, represents some 150,000 members working chiefly in the HVAC construction, metal products and related industries. It employed a total staff of about 70 people during the period in which this dispute arose, a substantial number of whom held field assignments. Approximately 23 employees occupying support staff positions in the Union's Washington offices processed dues payments and performed other clerical and administrative tasks in accounting, mailroom, receptionist and secretarial positions. All were represented by OPEIU, Local 2.

A series of prior agreements between the parties dating back to at least 1993, including the predecessor agreement running through September 30, 2005, had made provision for "flex-time" schedules allowing employees to start and end their work days within specified hourly ranges. When bargaining for a new Agreement commenced in the fall of 2005, however, the employer offered up a series of proposals aimed at, *inter alia,* eliminating unproductive time and thereby expanding service to SMWIA locals. After some back and forth, on November 10, 2005 a new Agreement was concluded in which  Local 2  agreed to

4

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

surrender the established 35-hour work week with two paid 15-minute daily breaks in favor of 40-hour work weeks, but with employees allowed to choose any one of four different alternative work schedules in which to complete their weekly work obligations.

Following ratification and implementation of the new Agreement, all 22 unit employees then on payroll were permitted to elect one of the four negotiated optional work patterns. All chose to work more than 35 hours per week, with 10 opting for Fridays off and 8 selecting Mondays. Except for one minor problem, ultimately adjusted, administration of this aspect of the new Agreement was unremarkable until June, 2006, when a conflict arose between the parties over who should absorb the expenses associated with administering the newly negotiated "Flexible Spending Account" benefit. When conferences on those issues failed to produce any resolution, OPEIU threatened to file a grievance.

In the meantime, the employer asserts that declining dues receipts and other financial pressures had stimulated an overall operational assessment in the spring of 2006. Based upon its analysis, it determined that the adoption of alternative work schedules had not generated the productivity improvements it had anticipated. Consequently, on June 20, 2006 newly appointed SMWIA General Secretary-Treasurer Joseph Nigro announced that all employees would revert to their regular 35-hour work weeks effective July 31, 2006. His announcement read in part:

> "This letter is to officially give you notice that due to departmental and business needs, any and all alternative work schedules will cease at the end of the work day on Friday, July 28, 2006. All collective bargaining unit members will return to a regular 5/35-work schedule effective Monday, July 31, 2006. Our notice fulfills the 10-day prior notice to employees as stipulated under Article V, Hours of Work-Overtime, paragraph titled, Establishment or Change of Hours..."

When the OPEIU's grievance dated July 6 remained unsettled following third step hearing, this arbitration ensued.

POSITIONS OF THE PARTIES:

The Employer

The SMWIA has fully complied with each and every obligation it undertook in the new contract. The grievance accordingly must be denied.

5

OPINION AND AWARD            SMWIA & OPEIU Local 2 – Alternative Work Schedules

Article V gives the employer the right to return employees to their regular work schedules if it concludes that the needs of the service so require. In this instance the record amply demonstrates that legitimate and compelling business reasons dictated more conventional work schedules. Consequently, there can be no principled basis upon which to find a violation of the Agreement.

As the record clearly reflects, upon becoming General Secretary-Treasurer in February, 2006, Mr. Nigro began to focus immediately on the SMWIA's operational and staffing needs with an eye to getting the international's operations back on a solid financial footing. Under express directives from the General President to cut expenses, Nigro began reducing or eliminating various costs, including those related to rental cars and weekend trips home for employees working in the field. Staffing levels were reviewed and vacant positions were left unfilled. Secretarial staff was realigned to provide for covering with four secretaries a workload previously handled by five people.

When Mr. Nigro turned his attention to employee productivity he concluded that the newly adopted alternative work schedules had added no value. Although employees were working longer work weeks, in departments such as Jurisdiction, where the volume of disputes between crafts had declined, there was no additional work to be done in the expanded hours—and, indeed, insufficient activity to even fill the former 35-hour weeks. As Nigro credibly testified, the changes had also produced several operational problems. Because 19 of the 22 bargaining unit employees had opted to work a 9/74 or 9/80 schedule, each was off every tenth work day, thus losing 26 work days annually over and above already generous leave allowances, including 45 days of vacation, holiday and sick leave for most employees. Alternative work schedules thus translated to 71 days off annually, 27% of the normal work year. Further, on some occasions in April, May and June, 2006, high numbers of bargaining unit employees were seen to be absent on Mondays and Fridays— half of the workforce was absent on Thursday, April 13, the day prior to the Good Friday holiday, a day when no employee was scheduled to be off. With few employees choosing to work beyond 4:30 p.m., the hoped-for extended coverage to service locals in the Midwest and West never developed. Additionally, since the work of most employees is job specific, when employees were absent, the work of their positions piled up until they returned,

6

OPINION AND AWARD        SMWIA & OPEIU Local 2 – Alternative Work Schedules

creating unnecessary delays. In the Membership Department, receipts processed both in total and on a per-employee basis had declined in the first five full months of working the expanded hours, indicating to Mr. Nigro that although the SMWIA was paying employees for a longer work week there was no concomitant increase in productivity.

The record is accordingly clear that in directing its employees to revert to the regular 35-hour work week, the employer was motivated by legitimate operational considerations as permitted under Article V, whose terms make flexible shifts contingent upon mutual agreement between employee and employer and allow changes when department needs arise. SMWIA's conclusion that there was no longer any benefit in having support staff come in early before their managers were in or the locals were open and then leave while those managers were still at work was amply supported by legitimate business reasons.

The OPEIU bears the burden of establishing the asserted violation. It has failed to carry that burden. The evidence demonstrates that the employer's decision to end the alternative schedules on grounds that they were not in its best business interests did not offend the Agreement.

<u>The Employees</u>

There are multiple reasons why the employer's elimination of alternative schedules announced June 20 and implemented July 31, 2006 violated the governing CBA. The grievance has merit and the employees are due a remedy.

First, a fair reading of the Agreement language, without more, supports the OPEIU's position that the employer's action was inconsistent with its contractual obligations. The Agreement employs several terms relating to the issues in dispute: (i) the pre-existing language of Article V applicable to "Flexible Shifts," carried forward unchanged without discussion and stating that such shifts are available where "feasible and mutually agreeable;" and, (ii) the new language related to the alternative work schedules, which does not leave the initial selection of such schedules to management but sets forth two standards for how they are established and changed. Initially they will be based on "departmental needs," but "approval will not be unreasonably withheld and will be based on business necessity." Plainly, the Agreement allows for changes in established alternative schedules only, "if a departmental need arises which would require a change." Both clauses were

7

**OPINION AND AWARD**          **SMWIA & OPEIU Local 2 – Alternative Work Schedules**

treated together in bargaining and should be read together. But if only the phrase, "if a departmental need arises," the narrowest reading, is applied to the changes in dispute, it is clear that the employer has not demonstrated such need.

Strong support for the proposition that SMWIA's rescission of the disputed schedules violated the Agreement can be found in the bargaining history leading up to adoption of the new benefits, the retaliatory events occurring immediately thereafter and the contradictory and inconsistent positions the employer has taken in its futile attempts to demonstrate genuine business necessity for these changes. With respect to the negotiations, it was the employer that proposed going to a uniform 40 hour work week and eliminating the paid break/lunch times. The OPEIU resisted, but ultimately was receptive to the notion provided employees had the option of doing their work under alternative schedules of their choosing. For that flexibility, and in return for an overall acceptable package of economic improvements, they surrendered their paid break/lunch time. The SMWIA now seeks to retain the benefits of the bargain it gained, but negate the OPEIU's wins--the additional hourly pay, the enhanced flexibility of working schedules tailored to employee needs and the incidental aid to pension funding flowing from additional hours worked.  supersede

During negotiations, SMWIA negotiator Tom Kelly expressed the view that the employer needed to retain the ability to change schedules in the event of unforeseen developments. Specific examples of such circumstances were discussed: the employer's convention; emergencies arising from natural disasters; another hostile terrorist attack. From that discussion the language of Article V emerged allowing for modifications to alternative schedules, "if a departmental need arises that would require a change." But Mr. Kelly was clear in stating that he did not intend that the employer could ever revert to uniform and limited scheduling. The changes made offend those understandings.

The events occurring thereafter are also telling with respect to the parties' intended meaning. Following ratification, all unit employees chose one of the new alternative schedules. Two went with the 5/40 work week; all others chose one of the two compressed work week schedules. The alternative work schedules worked without a hitch aside from one insignificant blip in the system when, in January, 2006, as employees were adjusting to the new schedules, management was required to remind those on non-work time to avoid

8

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

distracting co-workers. Effective March 1, however, Secretary Treasurer Tom Kelly resigned his position over issues with Employer President Michael Sullivan. Later that month, Office Manager Bishop was dismissed and Sullivan's former Assistant, Joseph Nigro, was named to replace Kelly. In April the employer then hired new office Manager Pat Emblem.

For a time, the alternative schedules continued to function as intended. In April, 2006, Nigro met with Local 2 Rep Linda Bridges and Chief Steward Brian Sullivan to discuss, among other issues, Nigro's request that the Local work with Ms. Emblem in an effort to reduce the number of employees taking their compressed schedule days off on Fridays or Mondays. OPEIU responded appropriately, and sometime in early May the parties agreed that no more than half the employees in a given area could be off on any given day except for unplanned eventualities such as sick or emergency leave.

Another dispute, however, then arose: whether the OPEIU or the SMWIA would absorb the costs of administering the newly negotiated Flexible Spending Accounts allowing employees to designate pre-tax dollars from their pay to cover certain categories of expenses. With no resolution of that matter in sight, on June 9 Steward Brian Sullivan told Ms. Emblem that Local 2 would be grieving the matter.

Shortly thereafter, Emblem met with Steward Sullivan and announced that employees would no longer be allowed to eat or drink at their desks. On June 20 the employer then announced the elimination of the alternative work schedules based on unspecified "departmental and business needs," notwithstanding that Ms. Emblem had never raised previous concerns about the operation of the schedules.

Beyond the bargaining history and obvious retaliatory motives in play here, Mr. Nigro's explanations and those of President Sullivan for SMWIA's actions have been varied, internally inconsistent and unsupported by any factual documentation. Both men assert that the decision was predicated upon financial need, with Sullivan specifically citing a drop in membership. BNA data, however, reflects a slight increase in SMWIA membership in 2005 and 2006. Ms. Emblem testified that at the time of hearing membership was 149,600. That represents an increase of more than 5000 from the 2006 BNA reports. Additionally, revenues were also up significantly as a result of an increase in

9

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

per capita dues in the year prior to new Agreement, a hike set to continue in place through the next five years. Further, although the employer announced "department and business needs" as its reasons for acting, it has never identified, either in grievance handling or in this proceeding, any departmental needs other than in the Membership unit, in support of its argument. Indeed, in the grievance process it cited the fact that employees were not at their desks every day. Nor has it ever explained why it could not have taken the issue into consideration on a less aggressive basis, department by department, except to state that it could not address individual employee needs for fear that unequal treatment of employees might lead to grievances from the OPEIU over such exceptions.

Despite the employer's assertions, the record here contains no evidence whatsoever as to business necessity reasons applicable to departments other than Membership. And the testimony of OPEIU witnesses demonstrates that as to that department, the employer's evidence of financial hardship is unreliable at best. While SMWIA insists that the increased hours did not produce increased dues processing in this department, as those employees most familiar with the work performed in that unit testified, the numbers produced on management's summaries are solely attributable to the volume of dues reports arriving from the locals. Dues receipts vary from month to month because some locals combine and send in several months at a time, and others are chronically inaccurate. Thus, monthly fluctuations in individual processing rates shown before and after alternative schedules were adopted are not an appropriate measure of employee productivity.

Accordingly, the real explanation for the employer's decision lies not in "financial necessity," but in the response Joseph Nigro gave to unit members when asked why he eliminated the disputed schedules: "because he could." And if further proof of the prevailing contemptuous attitude were required, one need only to consider this: in January, 2007 the employer announced its intention to contract out the work of its largest department—Membership.

The OPEIU has provided persuasive evidence of significant employee hardship flowing from this breach of the Agreement. Nancy Johnson testified that the 9/74 schedule had allowed her to forego using sick leave for treatment of chronic medical problems and that its elimination created financial hardship. Serena Holland says the new alternative

10

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

schedules had allowed her to reduce her commute time and aided with child care and medical appointments. Leah Atkins, suffering from seizures and unable to drive, has lost her ability to carpool. Patty Shoap stated that the flexible schedule enabled her to get the treatments she needs for a chronicle medical condition without using sick leave.

Lastly, the employer predicated its need for alternative schedules on a desire to increase services to its members by expanding hours of availability. Those priorities have now apparently changed under new SMWIA leadership. But such a re-ranking of priorities is not tantamount to a "departmental need requiring a change."

Local 2 estimated the cost of the paid lunch/break time it relinquished as 3% of payroll. It was a significant give-back, offset by the greater earnings from the expanded work week for hourly employees and beneficial impact on pension plan funding. So the new work schedules were a valuable benefit resulting from the 2005 contract, a key element of an overall balanced package of economic contract terms. Their elimination, and the elimination of the more limited flexible schedules that had existed since 1993, was a serious blow to the bargaining unit. It is treatment explainable solely in terms of a deep underlying animosity toward these employees. SMWIA acted in bad faith, to retaliate and penalize, and those actions should not go unpunished.

**OPINION:**

There is a lot going on here, plentiful action both on stage and in the wings.

The OPEIU asserts a number of equity arguments, stressing employee hardship and emphasizing that it would be an injustice to them and a windfall for the employer to sanction cancellation of a benefit so central to the deal. It convincingly demonstrates that the changes made were inconvenient for employees and discouraging for their bargaining committee. But none of these things are relevant if the SMWIA had the contractual right to rescind alternative schedules. If that action worked hardships on employees or detracted from the value of the bargain struck, but was not inconsistent with Agreement terms, the ensuing problems are for the parties to work through. And while it is no fun to say so, as a matter of contract interpretation the same is true if the changes were just pinch-minded

11

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

push-back for the positions OPEIU had taken on other fronts.[3] Thus, even if the OPEIU's hypothesis is indulged and the SMWIA was fuming over unrelated issues, that does not disqualify it from exercising rights it may have had under the Agreement, provided its actions met the standards set forth therein. The SMWIA's style may not have been warm and fuzzy; their word choices the wrong ones; their motives impure. In the end it doesn't matter much. The Agreement has the last word.[4]

Agreement language is thus the jumping off point. As an initial matter, the record is clear in establishing that as ultimately adopted it was the product of a joint OPEIU-SMWIA bargaining subcommittee. The OPEIU is thus correct in asserting that no presumptions apply in either direction.

Broadly speaking, it is apparent that the parties established that employees after their first year would have four scheduling options to supplement the already existing flexible shifts which had involved only starting and quitting times, not days worked or number of hours worked:

- 35 hours in 5 days, with normal hours of 9 to 4:30 p.m.

- 40 hours in five days, without specified starting or quitting times.

- Bi-weekly 9/74 schedule providing for a mix of 8 and 8 ¼ hour days totaling 74 hours every two weeks, with one weekday off every other week and no specified starting or quitting times.

- Bi-weekly 9/80 schedule providing for a mix of 8 nine-hour days and one eight-hour day, with one weekday off every other week and no specified starting or quitting times.

---

[3] Bosses, judging from the hot-selling bad-boss tomes, may be getting meaner. In any event, there is good evidence all around of managers with poor people skills, supervisors lost without their "cookbook" manuals, uncivil, sometimes abusive. Nothing  in this record supports the inference that SMWIA management fit that mold. At the same time, it is apparent that many OPEIU employees were loyal, long-service personnel, some with serious personal situations that would have benefited from a bit of flexibility on the part of their employer. The notion that those individual circumstances could not have been considered in approving/disapproving shift schedules for fear of grievances is dispiriting.
[4] Beyond the arguable relevance of "hostility" in this context, the theory zooms sideways when it is considered that newly appointed General Secretary Joseph Nigro, a 40-year SMWIA veteran, cut rental car and travel expenses and took other cost-reduction measures that affected employees beyond those represented by Local 2. Either he was willing to take extraordinary steps to mask his animus, a rickety proposition, or he was operating out of genuine concern for conserving costs. (The possibility of subcontracting the work of the Membership department is an issue not developed on this record, and nothing herein should be understood as bearing on that question.)

OPINION AND AWARD    SMWIA & OPEIU Local 2 – Alternative Work Schedules

Those general aspects of Article V are about as clear as anything gets in English. But whether such shifts, once established, may be modified, and if so, for what reasons, is a is a thornier question.

After first defining the "Regular Work Week" in terms of total number of hours required and range of start/quit times, and without saying how their lunch periods of varying duration are assigned or bid, Article V recites that "employees are able to elect an Alternative Schedule..."although setting no starting or quitting times for any of the 40 hour, 80 hour or 74 hour options. Some redundancy is apparent, with the Agreement reiterating for each option that, "...each employee will have the option of selecting" it. Three qualifications or limitations apply to all: (i) a Monday, Wednesday or Friday must be designated as the primary regularly scheduled off during the 4-day portion of the bi-weekly schedule, (ii) Tuesdays or Thursdays are subject to management's approval, and (iii) seniority will be the tie-breaker if the choices of all employees for the same day cannot be accommodated.

Under "Establishment or Change of Hours," there is more redundancy: "...the employee has the option of working a Regular Work Week or an Alternative Shift as described above." Employee preferences and seniority will receive consideration *when alternative work hours are established,* but neither bids nor seniority are dispositive:

> "However, the employer will determine the schedule based on departmental needs. Such approval will not be unreasonably withheld and will be based upon business necessity." (Emphasis supplied.) [5]

To this point, it is hard not to think that the contractual intent was to give employees the option of working such alternative shifts as the employer determines to make available based on departmental needs. It follows that if the employer decides there is no departmental need for alternative shifts, none need be offered, (or no employees need be authorized to fill those that are created.) Employer approval, based upon its assessment

---

[5] Both sides invoke the business necessity argument in support of their positions, although rules of grammar suggest that the "business necessity" reference here does not qualify the changing of schedules but the employer's approval (or disapproval) of the employees' expressed preferences for them. In the context of the question before us, it likely makes no difference, since in either case the employer's judgment alone drives the outcome. It may choose either to not establish such schedules based on departmental needs or not approve the employees' expressed preferences for them, depending on business necessity.

13

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

of need, is critical.

The final sentence of the "Establishment Or Change of Hours" provision simply obligates the employer to provide 10 days advance notice of change to employees. In this instance, that requirement was met with the nearly 5 weeks advance notice of change provided by SMWIA. In addition to timely notice, one other limitation is imposed on the employer in the exercise of those rights: changes must be based on departmental needs.

It is at this juncture that the OPEIU advances an argument that is creative, if intricate. Without serving it up in detail, it may be shorthanded as follows: Alternative shifts are necessarily flexible shifts, since they do not fit within the 9 a.m. to 4:30 pm. hours applicable to the "regular" work week. Flexible shifts under the prior agreement were required to be offered only "in departments where flextime is feasible and mutually agreeable." But the new Agreement language makes Alternative Shifts contingent upon "departmental needs." The Agreement language, therefore, is susceptible of two constructions. There is inherent conflict between the former conditions attaching to flexible schedules and those adopted in 2005 permitting changes in alternative schedules only if departmental needs arise. An important rule of contract construction requires that when contracts are amended the interpreter must construe an intent to change, since the drafters should not be presumed to have engaged in meaningless acts. Accordingly, although alternative schedules overlap flexible shifts, the limitation providing that flexible shifts need only be offered if feasible and mutually agreeable must be read as "superfluous and superseded" as to alternative schedules.

The guideline relied upon is time-honored—if there is conflict between old and new Agreement language, the new should normally be given meaning. But the question draws another serviceable rule of interpretation into play, one mandating that whenever possible, competing or conflicting terms must be reconciled in the first instance. Such an approach seeks to honor the use of all language, giving meaning to all words without negating any. That venerable rule seems to have application here. In our opinion, it is a strained reading of the Agreement to consider the settlement language addressing approval of/changes to alternative shifts as so utterly at odds with prior language regarding flexible shifts as to warrant a finding that the latter was superseded.

14

OPINION AND AWARD          SMWIA & OPEIU Local 2 – Alternative Work Schedules

The new language reveals no intention to deprive the SMWIA of the broad rights it enjoys under Article XIII and elsewhere under Article V in this regard. It can be harmonized with the purportedly incompatible language on flexible shifts by a more common-sensible construction. In our opinion, the tests of "feasibility" applicable to flexible shifts and "departmental needs" applicable to alternative shifts are for all practical purposes synonymous. They are roughly the difference between reciting that goods are untaxed or taxed at a zero rate. The two sets of conditions are thus harmlessly redundant, or, to the extent there are substantive differences, for purposes of this case the differences are not material. As to both flexible and alternative schedules, employer assent is required.

That conclusion gains vigor when it is considered that, (i) as noted, other examples of repetition and superfluous language are found throughout the Agreement, in conventional CBA drafting fashion, and (ii) it would be passing strange for the draftsmen to condition flexible shifts on SMWIA approval without doing the same for the more impactful alternative schedules. An employer's surrender of reasonable control over work schedules is idiosyncratic enough that it should not lightly be implied. Said another way, if the negotiators had intended to eliminate or curtail the SMWIA's right to modify alternative schedules as argued, those objectives would have been easily achieved by inserting a sentence in the "Establishment or Change of Hours" terms. The record supports a finding that in memorializing their understanding they neither expressly nor impliedly did so.[6]

Nonetheless, the OPEIU maintains, SMWIA has shown no departmental needs requiring these changes. The most it has done is offer limited evidence regarding the Membership department, and no evidence relating to the mailroom, the accounting depart-

---

[6] The OPEIU offers bargaining history in further support of its reading. No one ever contemplated going back to regular shifts other than for a few narrow exigencies specifically discussed, i.e., employer's convention; natural disasters; another act of terrorism. SMWIA negotiator Tom Kelly, since disaffected, said as much. But we reveal no trade secrets in reminding these sophisticated parties that it is not what the negotiators hope to get or think they are getting that is controlling. The most credible evidence of the intent to allow or prohibit schedule changes is the language the parties adopted to convey their intentions. Only if there is genuine ambiguity in terms is there any reason to poke around in the ashes of who said what to whom in bargaining. Thus, reliance on the verbal representations of OPEIU witnesses as to what Tom Kelly said would lead us into the deep end of the pool. We add only this: although we do not find ambiguity, in the interest of reaching a fully informed judgment, the OPEIU's evidence on point has been considered. While recognizing that no verbal understanding therein could vary express Agreement provisions, it warrants mention that no contemporaneously made bargaining note reflects the restrictive meaning now advanced by the OPEIU.

15

**OPINION AND AWARD**          SMWIA & OPEIU Local 2 – Alternative Work Schedules

ment or the receptionist positions. And even as to Membership, the employer's assertion that the longer work hours had not increased production statistics is incorrect. Not only did they exceed the employer' own average production ratings, those hours are not a valid gauge of work performed. Lastly, even if the alternative schedules did not yield a penny for penny value for the employer, that hardly translates to a departmental need "requiring" a change.

It is true that even though the Agreement speaks of department needs, the data in evidence relative to the employer's financial status is for the most part not department specific. The documentary evidence presented, however, taken together with the testimony of SMWIA's managers, reasonably establishes the fact of the SMWIA's broad financial distress, the lack of any corresponding productivity increase from adoption of expanded hours, and, while perhaps treatable in other ways, some degree of mischief associated with their continuance. For example, notwithstanding that the employer absorbed increased payroll costs, employees did in fact process fewer receipts in the first five full months working the expanded hours than they did in the comparable period in 2005, and those shortfalls are not satisfactorily explained. Additionally, absence patterns were shown to cluster around Monday and Friday off-days. Compounding those problems, other factors, including increased staff use of computers/Blackberries and heightened reliance on project labor agreements had triggered diminished workloads among the secretarial pool and within the Jurisdiction department, raising questions about the economics of continuing to pay for an expanded work week in the face of decreased work needs.

Notwithstanding the employee's reliance on conflicting reports regarding membership, we accept as credible the SMWIA's documented assertions that total membership was in decline, aggravated by an erosion in total dues receipts triggered by a combination of shifts in the composition of the membership and the trades in which members were working.[7] Thus, even though not all departments may have been affected equally, against that threatening background, in the department with the greatest number of covered

---

[7] BNA's "Directory of U. S. Labor Organizations" inexplicably reflects a membership increase of about 3% 2006 over 2005. Mr. Nigro's data, derived from SMWIA records, demonstrated a 2005 membership of 148,193 and a 2006 membership of 147,824. Additionally, the only segment of the membership showing an increase was that comprehending pre-apprentices, who pay flat, nominal dues of $10 monthly.

16

OPINION AND AWARD        SMWIA & OPEIU Local 2 – Alternative Work Schedules

employees, Membership, the credible evidence of record demonstrates decreased productivity. So while the OPEIU argues valiantly, its case is freighted up with classically difficult proof problems—it must offer persuasive evidence that SMWIA had no reasonable basis for, no "need," to modify work hours. It is a case facing long odds. The "department needs" language the negotiators adopted is wonderfully elastic. It cannot fairly be read to require the employer to establish that but for the changes the department would fail.

In sum, given that the SMWIA was, as alleged, operating in a generalized state of financial distress, and recognizing that the employer's individual departments are subordinate units of the larger organization and their interests subsumed within the more comprehensive whole, the employer's actions here must be found have reasonably met the governing test of "departmental need."

For the reasons stated above, we reject the OPEIU's view that the SMWIA violated the Agreement by requiring employees to revert back to their former 35-40 hour shift arrangements, decline to reach the charge of bad faith bargaining, and deny the grievance.

A W A R D

The Grievance is denied.

*James E. Conway*
James E. Conway
Arbitrator

Dated: August 26, 2007
Great Falls, VA

17